574 So.2d 87 (1991)
Richard Harold ANDERSON, Appellant,
v.
STATE of Florida, Appellee.
No. 72127.
Supreme Court of Florida.
January 3, 1991.
Rehearing Denied February 27, 1991.
*89 James Marion Moorman, Public Defender and Paul C. Helm, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen. and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Richard Harold Anderson appeals his conviction for the first-degree murder of Robert Grantham and the ensuing sentence of death.[1] We affirm.
Anderson's conviction rested primarily upon the trial testimony of his girlfriend, Connie Beasley. Beasley testified at trial that in 1987 Grantham had offered her $30,000 in exchange for her sexual favors. She rejected Grantham's offer but told Anderson of the proposal. Beasley testified that Anderson believed Grantham was rich and would return from a gambling trip to Las Vegas with a lot of money. Anderson told her to agree to spend one night with Grantham for $10,000. Anderson and Beasley prearranged for her to get Grantham drunk, after which Anderson would rob him. Beasley agreed to implement the plan by meeting Grantham on May 7, 1987, when he returned from Las Vegas. Following drinks and dinner, Beasley lured Grantham to Anderson's apartment. Anderson arrived later, ostensibly to return Beasley's car and to request a ride. Grantham agreed to drive Anderson, and Anderson insisted that Beasley join them. While in the car, Anderson shot Grantham four times and left Grantham's body in a wooded area. He then drove to the Tampa Airport, abandoned the car, and returned with Beasley to the apartment. He cut open Grantham's satchel and found $2,600.
The state also presented the testimony of two of Anderson's business acquaintances. David Barile testified that Anderson had told him the day after the murder that he had shot a man four times and dumped his body in the woods. Larry Moyer testified that Anderson had said on June 2, 1987, that he and his girlfriend "wasted a guy that was supposed to have a million dollars, and he only had $3,000." A firearms expert testified that four discharged .22-caliber cartridge casings found in Grantham's *90 car had been fired from a pistol recovered from the Hillsborough River. Florida Department of Law Enforcement ("FDLE") agents recovered the pistol near the bridge where, according to Beasley, Anderson had thrown it.
In the penalty phase, Scott Hopkins, an investigator for the state attorney, testified that he arrested Anderson in 1973 for the first-degree murder of a Clearwater resident and that Anderson pled guilty to the crime. On cross-examination, investigator Hopkins testified that an accomplice, not Anderson, was the actual perpetrator of that murder.
Anderson refused to permit defense counsel to call any witnesses on his behalf during the penalty phase. Defense counsel merely introduced the information charging Beasley, Anderson's girlfriend, with third-degree murder, to show that Anderson was treated more harshly than Beasley. The jury recommended the death penalty by an eleven-to-one vote. The trial court found two aggravating circumstances,[2] a single mitigating circumstance,[3] and imposed the death penalty.

GUILT PHASE
Anderson contends in his first point that the trial court erred when it failed to dismiss the indictment because the indictment was based upon Beasley's perjured testimony before the grand jury. During her trial testimony, Beasley admitted that her grand jury testimony differed from her trial testimony. When she appeared before the grand jury on July 15, 1987, she minimized her role in the killing and said that Grantham had been killed outside of her presence. She told the grand jury that Anderson and Grantham went for a ride while she remained in Anderson's apartment. When Anderson returned alone, he had blood all over the front of his shirt and on his hands, and his eyes were wild. She charged that Anderson admitted killing Grantham and threatened to kill her unless she helped him take Grantham's car to Tampa Airport.
After testifying before the grand jury, Beasley told a different story to FDLE agents. She told the agents on July 16 that Anderson walked into the apartment while Grantham was trying to rape her. Anderson pulled Grantham away, told her to get dressed, and forced Grantham into the car at gunpoint. Beasley also stated that she told agents that she saw Anderson shoot Grantham four times.
On July 24, Beasley negotiated a plea to third-degree murder with a maximum sentence of three years. Beasley told the prosecutor that she was present when Anderson shot and killed Grantham in accordance with a prearranged plan. She told the same story at trial. Anderson argues that because the state knew prior to trial that Beasley's grand jury testimony was perjured and did nothing to correct the testimony, the indictment should have been dismissed.
In Johnson v. State, 157 Fla. 685, 694, 27 So.2d 276, 281 (1946), cert. denied, 329 U.S. 799, 67 S.Ct. 491, 91 L.Ed. 683 (1947), this Court held that courts may not inquire into the sufficiency, legality, or character of evidence presented to a grand jury. Johnson addressed whether the trial court denied the defendant due process when it denied his motion to quash the information assertedly based on insufficient evidence. Until now Florida has not directly addressed the specific issues raised when the state presents false testimony to the grand jury or discovers prior to trial that the indictment upon which a defendant is to be tried is based upon perjured testimony. However, federal courts as well as other state courts have considered these questions.
*91 In United States v. Basurto, 497 F.2d 781 (9th Cir.1974), the chief state witness notified the prosecuting attorney that all his grand jury testimony relating to the defendants, and upon which the indictment was based, was untrue. The prosecuting attorney informed opposing counsel of the perjured grand jury testimony. Nevertheless, the court of appeals reversed the defendants' convictions because the prosecutor failed to notify the trial court and the grand jury of this material perjured testimony. The Ninth Circuit Court of Appeals held that
the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. Whenever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel  and, if the perjury may be material, also the grand jury  in order that appropriate action may be taken.
Id. at 785-86. See also Fla.R. Regulating Fla. Bar 4-3.3(a) ("A lawyer shall not knowingly: ... (4) Offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.").
Likewise, in People v. Pelchat, 62 N.Y.2d 97, 464 N.E.2d 447, 476 N.Y.S.2d 79 (1984), the Court of Appeals reversed the defendant's conviction even though it was based upon his guilty plea. The only evidence linking Pelchat to the crime was the grand jury testimony of a police officer who admitted to a prosecutor before the plea that he had been mistaken and the testimony was untrue. Under the circumstances, the court held that the prosecutor was duty bound to disclose the admission to the court and seek its permission to reindict the defendant. Id. at 106, 464 N.E.2d at 452, 476 N.Y.S.2d at 84. See also Escobar v. Superior Court, 155 Ariz. 298, 301, 746 P.2d 39, 42 (App. 1987) (prosecutor in child abuse case was aware that material testimony of police detective was erroneous concerning the nature, extent, and severity of burns inflicted on child and the prosecutor should have informed the court and grand jury); State v. Reese, 91 N.M. 76, 79, 570 P.2d 614, 617 (Ct.App. 1977) (defendant's conviction reversed because prosecutor knowingly presented to a grand jury an officer's false testimony relating to question of defendant's constructive possession of the drugs he was charged with possessing).
We agree with the authorities cited by Anderson that due process is violated if a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel, and the grand jury. This policy is predicated on the belief that deliberate deception of the court and jury by the presentation of evidence known by the prosecutor to be false "involve[s] a corruption of the truth-seeking function of the trial process," United States v. Agurs, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), and is "incompatible with `rudimentary demands of justice.'" Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972) (citation omitted). Moreover, deliberate deception is inconsistent with any principle implicit in "any concept of ordered liberty," Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), and with the ethical obligation of the prosecutor to respect the independent status of the grand jury. Standards For Criminal Justice § 3-3.5, 3-48  3-49 (2d ed. 1980); United States v. Hogan, 712 F.2d 757, 759-60 (2d Cir.1983); Pelchat, 62 N.Y.2d at 108-09, 464 N.E.2d at 453, 476 N.Y.S.2d at 85 (the "cardinal purpose" of the grand jury is to shield the defendant against prosecutorial excesses and the protection is destroyed if the prosecution may proceed upon an empty indictment).
The Florida Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Art. I, § 9, Fla. Const. The state violates that section when it requires a *92 person to stand trial and defend himself or herself against charges that it knows are based upon perjured, material evidence. Governmental misconduct that violates a defendant's due process rights under the Florida constitution requires dismissal of criminal charges. State v. Glosson, 462 So.2d 1082, 1085 (Fla. 1985).
However, this principle is unavailing in Anderson's case because Beasley's grand jury testimony, although false in part, was not false in any material respect that would have affected the indictment. In every statement Beasley made, she consistently accused Anderson of the murder. Before the grand jury, she accused Anderson, but claimed he was alone when he murdered Grantham. At trial, she again accused Anderson, but switched her role in the murder from nonparticipant to unwilling, after-the-fact accomplice. Although Beasley's role changed, Anderson's did not. Here, we are not faced with subsequent testimony that can be said to remove the underpinnings of the indictment. On the contrary, Beasley's later testimony would have strengthened the probability of an indictment because she was an eyewitness to the murder. Thus, Beasley's perjurious grand jury testimony could have had no factual bearing on the grand jury's decision to indict Anderson for the murder. Cf. Giglio, 405 U.S. at 154, 92 S.Ct. at 766 ("`the false testimony could [not] ... in any reasonable likelihood have affected the judgment of the [petit] jury,'") (quoting Napue, 360 U.S. at 271, 79 S.Ct. at 1178)). Nor are we faced with any deliberate subornation. This is not a case where the state knowingly presented false testimony to the grand jury. For these reasons, we reject Anderson's first claim.
Anderson next argues that the trial court should not have permitted FDLE Agent Velboom to testify about two out-of-court statements Beasley made to him because each violated the hearsay rule. In one, Agent Velboom testified that when Beasley was arrested on July 1, 1987, she told him: "[Anderson] did it, and I knew about it." In the other, he testified that Beasley told him on August 20 that "Mr. Anderson [said] they should return to where Grantham's body had been left and take it to Orlando because it would be easier to hide over there."
Anderson argues that the statements were inadmissible under sections 90.801-.802, Florida Statutes (1985), because they were out-of-court statements offered to prove the truth of the matter asserted. The state argues that Agent Velboom's out-of-court statements were not hearsay, and were admissible under section 90.801(2)(b), Florida Statutes (1985). That section provides:
(2) A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
... .
(b) Consistent with his testimony and is offered to rebut an express or implied charge against him of improper influence, motive, or recent fabrication. .. .
During cross-examination, defense counsel attempted to impeach Beasley by suggesting that she fabricated her trial testimony after negotiating a favorable plea. Thus, if Beasley's statements to Velboom were made before her alleged motive to falsify arose, the state was entitled to present Beasley's prior consistent statements to rebut the implication of recent fabrication, pursuant to section 90.801(2)(b). Jackson v. State, 498 So.2d 906, 909-910 (Fla. 1986); Dufour v. State, 495 So.2d 154, 160 (Fla. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1332, 94 L.Ed.2d 183 (1987); Gardner v. State, 480 So.2d 91, 93 (Fla. 1985); Quiles v. State, 523 So.2d 1261, 1263 (Fla. 2d DCA 1988).
In this case, the defense implied that Beasley changed her story after making her plea agreement. Because Beasley made her July 1 statement to Agent Velboom before the July 24 plea agreement, Velboom's testimony was not hearsay and was properly admitted. In contrast, the trial court erred in admitting Velboom's testimony about Beasley's August 20 statement because it was made after the plea agreement, when the alleged motive to falsify *93 arose. Jackson, 498 So.2d at 910; Quiles, 523 So.2d at 1263. We are persuaded, however, in light of the entire record that in this case there is "no reasonable possibility that [this] error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
Third, Anderson contends that the trial court erred on two occasions by permitting state witnesses to testify about other statements or acts committed by Anderson solely to prove bad character or propensity. On the first occasion, Beasley was permitted to testify over objection that Anderson, the afternoon following Grantham's murder, showed her what "looked like a machine gun." She said he told her, "if it ever got hot or the heat was on, or hot, that he could take out a couple of people with that." On the next occasion, the court permitted Kenneth Gallon, a cell mate, to testify that Anderson offered him money to kill Beasley. Gallon said that while incarcerated in the Hillsborough County Jail, he and Anderson watched a television news broadcast reporting Grantham's murder investigation. During the broadcast, the camera focused on Beasley, at which time Anderson said: "Boom, bitch, you're dead." After the broadcast, Anderson offered Gallon money to murder Beasley.
We conclude that the testimony of Beasley and Gallon was properly admitted. Anderson's consciousness of guilt could be inferred from his conduct and his statements, and was, thus, relevant to the material issue of his guilt. Sireci v. State, 399 So.2d 964, 968 (Fla. 1981) (evidence of a suspect's desire to evade prosecution or attempt to prevent witness from testifying is admissible as relevant to the consciousness of guilt that may be inferred from such evidence), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982); Straight v. State, 397 So.2d 903, 908 (Fla.) (same), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981).[4]
Next, Anderson argues that the trial court improperly admitted as substantive evidence the prior inconsistent statements of inmate Tony House. House was called as a defense witness. He testified on direct examination that he watched the television coverage of Grantham's murder investigation while in the cell with Anderson and Gallon and that Anderson did not make any statements to him regarding the case.
On cross-examination, the state attempted to impeach House with his prior sworn statement to prosecutors that Anderson had made incriminating remarks during the telecast. House admitted that he made the prior statement, but explained that he himself had not heard Anderson make any incriminating remarks. He said he merely relayed what someone told him Anderson had said. When the prosecutor questioned House about his specific statements attributing inculpatory remarks to Anderson, House testified that he did not recall having made the statements. The state called as a rebuttal witness the court reporter who took House's sworn statement. Over defense objection, the trial court permitted the court reporter to read House's prior statement to the jury.
We agree that House's prior inconsistent statement could not be admitted as substantive evidence. See, e.g., Dudley v. State, 545 So.2d 857, 859 (Fla. 1989). However, in this case the evidence was admitted solely for impeachment. We find no error.
We also reject Anderson's contention that he was denied a fair trial because the videotaped news report of Grantham's murder investigation viewed by the jury depicted Anderson in jail clothes. The videotape, one and one-half minutes in length, showed a single, brief glimpse of Anderson *94 wearing prison garb. Under the circumstances, there was no "constant reminder of the accused's condition," Estelle v. Williams, 425 U.S. 501, 504, 96 S.Ct. 1691, 1693, 48 L.Ed.2d 126 (1976), to support the conclusion that Anderson was denied a fair trial.
Finally, Anderson claims that the trial court improperly denied defense counsel's request that the jury be instructed on accessory after the fact because his theory of defense was that Beasley, not himself, murdered Grantham. He argues that he was merely an accessory, and that the jury should have been instructed to acquit him if the jury found that evidence supporting his theory of accessory after the fact created a reasonable doubt about his guilt of first-degree murder. We reject this claim because the state did not charge Anderson with the crime of accessory after the fact, nor is accessory after the fact a lesser included offense of premeditated murder. Moreover, accessory after the fact is not a legal defense. For these reasons, Anderson was not entitled to a jury instruction on that offense. Palmes v. State, 397 So.2d 648, 652 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981).
We have reviewed the record and find substantial competent evidence to support the conviction of first-degree murder.

PENALTY PHASE
Anderson's sole challenge to the penalty relates to his "waiver" of the right to present witnesses in mitigation. The record shows that Defense Counsel Mark Ober initiated the following colloquy:
MR. OBER: Judge, at this time, I would like to announce to the Court and certainly allow the Court, for the limited purpose of this inquiry, to address Mr. Anderson, but based on my involvement in this case and also with the assistance of Mr. Ashwell, we have uncovered many witnesses that I feel could testify in Mr. Anderson's behalf, favorably to him, during the second phase.
And I would cite the names of those individuals which we have found. That would be Dr. Robert M. Berland; William Anderson, who is Mr. Anderson's father; Helen Anderson, his mother; David Anderson, his brother; Vickie Barber, his sister; Griffin Simmons, a sister of his; also a Joyce Wilson, a witness; and his son, Kyle Anderson.
In addition to that, we have gone to the correctional institute of individuals that  of individuals in the system who know Mr. Anderson based on his past incarceration, one Chaplain William Hanawalt, Major Sammy Hill, who is a correctional officer at Zephyrhills Correctional Institute and Superintendent Ray Henderson at the Department of Corrections in Lauderhill, Florida.
Additionally, there are other witnesses including employers and employees of Mr. Anderson, his friends, including Kay Bennett, who I believe could lend some assistance to Mr. Anderson during this portion of the proceeding.
After very great detail with him in the presence of [two witnesses], myself, and Mr. Anderson, over the portion of time that I've been involved in this, he has never wavered in his desire not to have any of these people testify during the course of this second phase proceeding. I have told him that I believe it to be in his best interest, and I'm announcing that for the record.
And he has commanded me not to call these individuals because that is his desire.
THE COURT: You wish to question Mr. Anderson concerning what you just said, Mr. Ober?
MR. OBER: Mr. Anderson, you heard my statement to Judge Graybill. Is there anything that you would like to add to that?
Do you concur in the statements I made or do you disagree with them, or do you, at this time, want any individuals, those I mentioned or anyone else that, perhaps, we hadn't discussed, who will assist you in this second phase proceeding?
THE DEFENDANT: I concur with the statements you made.
MR. OBER: And 

*95 THE DEFENDANT: I would rather not have any witnesses testify on my behalf that you mentioned or that could, in fact, be called.
THE COURT: Mr. Anderson, are you on any kind of drugs or medication that would affect your ability to understand what's going on today?
THE DEFENDANT: No, sir, not at all.
THE COURT: All right. Mr. Ober, you put it on the record. Mr. Anderson has responded.
Anderson argues that the waiver of his right to present mitigating testimony amounted to a waiver of his right to effective assistance of counsel. As such, he claims, the trial court was compelled to conduct an inquiry on the record under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), to determine whether Anderson knowingly, intelligently, and voluntarily waived that right. Alternatively, Anderson argues, the principle of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), compelled the trial court to determine whether Anderson made a knowing, intelligent, and voluntary waiver of his constitutional right to present mitigating evidence. We find that Faretta and Johnson do not apply to the situation before us and that the trial judge had no obligation to conduct a Faretta inquiry since Anderson was represented by counsel.
Accordingly, we affirm the conviction and the sentence of death.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and GRIMES, JJ., concur.
EHRLICH, J., concurs with an opinion, in which SHAW, C.J. and KOGAN, J., concur.
BARKETT, J., concurs in part and dissents in part with an opinion.
KOGAN, J., concurs in result only.
EHRLICH, Justice, concurring.
I joined Justice Barkett's dissent in Hamblen v. State, 527 So.2d 800, 804 (Fla. 1988), and if the colloquy initiated by defense counsel Mark Ober had not taken place in this case, I would dissent.
I am apprehensive that the majority opinion may be construed to mean that no inquiry need be made where a death penalty defendant waives his right to present mitigating witnesses. I am of the view that an inquiry must be made by the court to satisfy the trial judge that the waiver is knowingly, intelligently and voluntarily made. While the colloquy that was had here could have been expanded upon to include further inquiry as to the likely consequences of the defendant's waiver, I am satisfied that it was sufficient to meet any constitutional requirement, and for this reason, I concur in the Court's opinion.
SHAW, C.J., and KOGAN, J., concur.
BARKETT, Justice, concurring in part, dissenting in part.
I concur with the majority's opinion except for the conclusion that Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), does not apply to a defendant's decision to refrain from presenting any defense to the death penalty.
There is no doubt that a defendant has a constitutional right to present mitigating testimony. See, e.g., Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); Skipper v. South Carolina, 476 U.S. 1, 8-9, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986); Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). It is also clear that Anderson was within his rights to choose not to call witnesses in his own behalf. See Blanco v. State, 452 So.2d 520, 524 (Fla. 1984) (defendant's decision to call witnesses contrary to counsel's advice and his best interest ultimately was the defendant's decision to make), cert. denied, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 953 (1985). The question presented here is whether waiving the right to present mitigating testimony in the penalty phase of a capital trial is a decision of such great magnitude that minimal procedural safeguards must be followed to assure on the *96 record that the waiver was knowingly, intelligently, and voluntarily exercised.
In Faretta, the Court was concerned with a conflict between two distinct ideas. One is the notion that a defendant cannot be assured of getting just and fair treatment in the complex judicial process unless he has a lawyer. The other notion is that a defendant has a right to represent himself, even if it means that he may not get the same effective quality of representation to which he is entitled when represented by counsel. The Court held that the defendant has the right to represent himself, and therefore he may waive the right to counsel. However, because the consequences of waiving the right are so great, the Court imposed a procedural safeguard to ensure that the record reflects "that `he knows what he is doing and his choice is made with eyes open.'" Faretta, 422 U.S. at 835, 95 S.Ct. at 2541 (citation omitted). Trial courts must fully inform defendants of the "perils" of self-representation. Goode v. State, 365 So.2d 381, 383 (Fla. 1978), cert. denied, 441 U.S. 967, 99 S.Ct. 2419, 60 L.Ed.2d 1074 (1979).
The Supreme Court required the same kind of procedural safeguard to protect a defendant's constitutional rights in the capital punishment case of Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). In Boykin, a jury sentenced the defendant to death after the defendant pled guilty without a judicial inquiry into the knowing and voluntary nature of the plea. The Court's analysis focused on the dire consequences of the guilty plea and notions of judicial efficiency and economy:
What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought and forestalls the spin-off of collateral proceedings that seek to probe murky memories.
Id. at 243-44, 89 S.Ct. at 1712-13 (citations and footnote omitted). The Court concluded that the constitution requires trial courts to put on the record an affirmative showing that a defendant's guilty plea was intelligent and voluntary. Cf. Gilmore v. Utah, 429 U.S. 1012, 1013, 97 S.Ct. 436, 437, 50 L.Ed.2d 632 (1976) (stay of execution terminated because record evidence established "that the State's determinations of his competence knowingly and intelligently to waive any and all such rights [to appeal] were firmly grounded").
I recognize that this case does not involve a guilty plea. However, it is well settled that the federal and state constitutions require special procedural protections of a death-sentenced defendant's rights because "[t]here is no question that death as a punishment is unique in its severity and irrevocability." Gregg v. Georgia, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976) (plurality opinion); State v. Dixon, 283 So.2d 1 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). As Justice Stevens observed:
[E]very Member of this Court has written or joined at least one opinion endorsing the proposition that because of its severity and irrevocability, the death penalty is qualitatively different from any other punishment, and hence must be accompanied by unique safeguards to ensure that it is a justified response to a given offense.
Spaziano v. Florida, 468 U.S. 447, 468, 104 S.Ct. 3154, 3166-67, 82 L.Ed.2d 340 (1984) (Stevens, J., concurring in part and dissenting in part). Therefore, we must look at this issue in light of the different concerns raised when a defendant makes what may be a life-or-death decision.
The decision to waive the right to present witnesses in mitigation carries with it the most dire consequences possible under the law  failure to present mitigating testimony may amount to virtually a life-or-death decision. The decision to waive the right to present mitigating testimony in a capital case is of no less significance than the decision to plead guilty to a crime. Any other conclusion would be illogical and *97 would produce absurd results. For example, a trial court is required by Boykin to conduct a record inquiry of a defendant's guilty plea to a first-degree misdemeanor charge of criminal mischief, section 806.13(1)(b)(2), Florida Statutes (1989), but the same trial court would not have to hold the same inquiry when the defendant is facing a sentence of death in the electric chair when he waives his right to put on mitigating evidence in the penalty phase of a capital case.
These principles compel me to conclude as a matter of constitutional law that a judicial inquiry was required to protect Anderson's constitutional rights, and that the inquiry in Anderson's case failed to satisfy that requirement. "The rights, responsibilities and procedures set forth in our constitution and statutes have not been suspended simply because the accused invites the possibility of a death sentence." Hamblen v. State, 527 So.2d 800, 804 (Fla. 1988).
I also find that the practical concerns addressed by the United States Supreme Court are compelling reasons to require a record inquiry. Such an inquiry would leave "a record adequate for any review that may be later sought and forestalls the spin-off of collateral proceedings that seek to probe murky memories." Boykin, 395 U.S. at 244, 89 S.Ct. at 1712-13 (footnote and citations omitted). To require a simple inquiry would have no detrimental effect on the administration of justice. It would require no additional judicial resources to protect the rights of a death-sentenced defendant. In fact, it would facilitate this Court's mandatory review of death penalty appeals.
Moreover, this Court's decision in Hamblen supports my conclusion. In Hamblen, the defendant asked the trial court to revoke the appointment of the public defender so that he could conduct his own defense; he pled guilty to first-degree murder; and then in the penalty phase he presented no mitigating evidence and waived his right to have a jury consider whether he should be executed. This Court found that Hamblen's waiver sufficiently protected his rights because the trial court conducted a full hearing in accordance with Faretta and Goode, and adduced evidence on the record to show that Hamblen was "clearly competent" to make a knowing, intelligent, and voluntary waiver. Hamblen, 527 So.2d at 804. I would require the same hearing in this case.
NOTES
[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
[2] The trial court found that Anderson previously had been convicted of another capital felony, section 921.141(5)(b), Florida Statutes (1985), and treated as one aggravating circumstance that the murder was committed for pecuniary gain, id. section 921.141(5)(f), and in a cold, calculated, and premeditated manner. Id. § 921.141(5)(i).
[3] Anderson's accomplice, Connie Beasley, was allowed to plead guilty to murder in the third degree, for which she could receive a maximum potential sentence of three years' imprisonment.
[4] We note that both Sireci v. State, 399 So.2d 964, 968 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2257, 72 L.Ed.2d 862 (1982), and Straight v. State, 397 So.2d 903, 908 (Fla. 1981), cited Williams v. State, 110 So.2d 654 (Fla.) (specifying limited circumstances when evidence of similar crimes may be admitted), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). However, the nature of the evidence here, as in Sireci and Straight, is not evidence of similar wrongs addressed in Williams and section 90.404(2), Florida Statutes (1985), but is analogous to evidence of flight. Proof of a defendant's acts related to the offense charged is admissible to prove a defendant's acknowledgement of guilt.