STATE of Tennessee

v.

James Edward TAYLOR.

Supreme Court of Tennessee,
at Knoxville.

Oct. 25, 2007 Session Heard
at Maryville.[1]

Dec. 19, 2007.

1. Oral argument was heard in this case at the Blount County Justice Center in Maryville, Blount County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Dwight E. Scott, Nashville, Tennessee, for the appellant, James Edward Taylor.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Pamela S. Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JJ., joined.

A jury convicted the Defendant, James Edward Taylor, of first degree felony murder and especially aggravated robbery. The Court of Criminal Appeals affirmed the Defendant's convictions. We granted permission to appeal and address two issues: (1) whether the trial court erred by allowing the jury to watch a videotape in which the Defendant appears in custody and wearing jail attire; and (2) whether the trial court erred in admitting hearsay testimony about the Defendant's familial relationship with Sabrina Lewis. We hold that the trial court did not err in admitting the videotape but did err in admitting the hearsay testimony. We conclude, however, that the trial court's error was harmless. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

## Factual and Procedural Background

Gary and Linda Finchum owned and operated the Always Antiques store in Madison, Davidson County, Tennessee. They kept the business's money in a cash register in the store, and Mr. Finchum also kept cash in his front pants' pockets and in his billfold. In June 2001, a woman visited the store to inquire about selling two vases, one of which she had with her. Ms. Finchum told the woman that she would have to return at a time when Mr. Finchum could evaluate the items. The woman left and took the vase with her. The woman returned to the store in early July without the vases but with a female companion. She walked around the store and asked Ms. Finchum "kind of off-the-wall questions." Ms. Finchum told Mr. Finchum, who was also in the store during this visit, that this woman was "the lady with the vases"; the woman told them she would return later.

About a week later, on July 13, 2001, Mr. Finchum was in the store and Ms. Finchum was home preparing to join him. Mr. Finchum called and told her that "the woman with the vases is coming in." Ms. Finchum left for the store shortly thereafter.

Mary Ann Fisher was stopped at a red light in front of Always Antiques headed north on the morning of July 13, 2001. The shop was on her right. Ms. Fisher testified that she saw a black man come out of the store "and was standing there swaying back and forth and he had something black in his hand going from one hand to the other with it." The man was wearing a red short-sleeve shirt, blue jeans, and tennis shoes. Ms. Fisher stated that he was about six feet tall, "real skinny," and had very short hair. As she watched the man, he left the front of the store and ran behind her car; she lost sight of him at that point.

Ms. Fisher testified that just as the red light turned green for her lane of traffic, a car came out of the side street bordering Always Antiques. This car ran its red light, went through the intersection, "almost hit" Ms. Fisher's car, and turned left/south. Ms. Fisher saw the woman driv-

er and later identified her from photographic arrays as Sabrina Lewis. Ms. Fisher also identified the Defendant from photographic arrays as the man she had seen in front of Always Antiques. She again identified this man at trial as the Defendant.

Brenda Farmer and Judith Summers worked in the business adjacent to Always Antiques. On July 13, 2001, they heard some loud noises that sounded like boxes falling. To investigate the cause of the noise, Ms. Summers went to the rear of her store and looked out the back door into the parking lot. She saw a car with its motor running, its front passenger door open, and someone sitting in the front passenger seat. It appeared that as many as three people may have been in the front seat. Ms. Summers described the car as "longer than the way they build cars now" and testified that it may have been gray in color.

Still mystified about the source of the noise and thinking it may have originated in Always Antiques, Ms. Summers and Ms. Farmer finished assisting their customers and then went next door to check on Mr. Finchum. It was quiet when they entered the store, and they did not see anyone. When they called out, Mr. Finchum replied, "Help me, help me." The women found Mr. Finchum lying on his stomach in one of the store aisles. He said, "Help me, I've been shot." Ms. Farmer ran back to her business and instructed the other employees to call 911.

When Ms. Summers inquired as to his assailant, Mr. Finchum said, "It was a black man." When Ms. Farmer returned to the victim she saw a hat lying on the floor nearby. Mr. Finchum told her the hat did not belong to him. When Ms. Farmer inquired who had shot him, Mr. Finchum replied, "a black man in blue jeans." When the women asked if he had

been robbed, he said, "They tried." At his request, Ms. Summers recovered Mr. Finchum's wallet from his back pants' pocket and handed it to Ms. Farmer. Ms. Farmer later turned it over to Ms. Finchum.

Metro police officer James Chastain was the first officer on the scene. As he attended to Mr. Finchum, Mr. Finchum told him that he had been shot three times. Officer Chastain asked if Mr. Finchum had been robbed, and Mr. Finchum responded, "He tried to." The victim described his assailant as an African–American male, young, but older than a teenager. Mr. Finchum also told Officer Chastain that the hat on the floor belonged to his attacker. As he was being attended to by paramedics, Mr. Finchum told Officer Chastain that "the lady's information is on the desk." When the officer asked what lady he was talking about, Mr. Finchum responded, "the lady that was in here earlier, the lady with the vases." Mr. Finchum told Detective William Stroud, a personal friend who also reported to the scene, that the woman's name was "on the counter." Det. Stroud walked over to the desk and retrieved a piece of paper that had Sabrina Lewis' name and driver's license number written on it along with the words "two vases." Officer Chastain asked Mr. Finchum if the woman was connected to the attack, and Mr. Finchum said, "I know she is."

Ms. Finchum arrived at the store after the shooting but before Mr. Finchum was taken to the hospital. Ms. Farmer gave her Mr. Finchum's wallet; the money was still inside. Ms. Finchum accompanied her husband to the hospital where he died during surgery. Ms. Finchum did not recover any cash from her husband's clothes.

Ms. Finchum subsequently identified the woman with the vases as Sabrina Lewis. She also reviewed a photograph of two

vases that the police had taken in the store after the shooting and stated that the vases looked like the one that Ms. Lewis had brought to the store in June.

Crime scene officers collected two bullets from the shop and took custody of the hat found on the floor near the victim. A third bullet was recovered from the victim's body, who, according to medical testimony, had been shot twice. Testing revealed that the two bullets recovered from Always Antiques and the third bullet recovered from the victim had all been shot from the same weapon, a .38, .357, or .9mm handgun. The murder weapon was not recovered. The victim's cause of death was determined to be multiple gunshot wounds.

Metro Police Officer Gary Smith testified that he had seen the Defendant previously at Sabrina Lewis' sister's house. Officer Smith's half-sister, Tori Renfro, told Officer Smith that the Defendant and Lewis were cousins. Officer Smith stated that Sabrina Lewis' mother was Renfro's aunt and that Renfro and Lewis were first cousins.

Melvin Harding testified that in the fall of 2001, he was serving a ninety-day sentence in the Davidson County Jail for domestic violence. The Defendant was his cellmate in November 2001. One night, the Defendant told Harding that he had something on his mind and wanted to talk about it. The Defendant told Harding, "I'm the one who committed the crime [at Always Antiques]." The Defendant then told Harding the following: the Defendant's cousin had gone to the antique store and "cased out some lamps." She came back to the Defendant and told him that

the victim had a lot of money in his wallet. She later drove him and his aunt to the store. The Defendant, who was wearing a large sombrero and sunglasses and had shaved his head, went into the store. The Defendant had a sock over his arm so that he would not leave fingerprints on the door. The Defendant lured the victim to the back of the store, pulled out a .38 revolver, and ordered the victim to lie down. The Defendant shot the victim in the shoulder and the stomach and then shot the victim a third time. The Defendant got three hundred dollars out of the victim's front pocket but got scared and did not get "the big money ... in his wallet." The Defendant ran outside to his aunt and cousin, who were waiting in the car, and told them that he had shot the victim three times. According to the Defendant, the police went to his cousin's house later that day because she had left some identification at the store.

Harding testified that he told his attorney about the Defendant's confession and that the police contacted Harding. The police moved the Defendant and Harding into a holding cell equipped with audio and visual recording equipment, hoping that Harding could get the Defendant to confess to shooting the victim. Harding testified that, although he tried to get the Defendant to talk about the crimes, the Defendant was suspicious and told him he was not going to talk about that for fear of recording equipment. The videotape of the Defendant and Harding in the holding cell was played for the jury near the end of Harding's direct testimony.[2]

On Harding's agreement to continue cooperating with the police, Harding was

---

2. The videotape, which we have viewed, appears to have been recorded by equipment placed behind a grate in the ceiling of the cell. Although the view is somewhat obscured, one of the men can be seen walking around the cell and conversing with another man who is sitting on a ledge. From time to time the walker steps up onto the ledge, further obscuring his head and face.

released early and his misdemeanor domestic assault conviction was "retired." Harding thereafter allowed himself to be "wired" in an attempt to record a confession from the Defendant after they were both released from jail. These attempts were unsuccessful. On cross-examination, Harding acknowledged having a 1988 conviction for aggravated assault and seeing information about the Always Antiques robbery on television. He stated that he did not remember testifying at the Defendant's preliminary hearing that Detective Bernard gave him a couple hundred dollars for his help with this case.

Detective E.J. Bernard testified that he interviewed Harding about the alleged confession. According to Det. Bernard, Harding relayed accurate details about the crimes that had not been released to the media. Det. Bernard also confirmed that Harding and the Defendant had been housed together at the jail.

Det. Bernard testified that hairs from the hat found at the crime scene were tested and compared to the Defendant's DNA. Also tested were hairs from Sabrina Lewis' sons. The parties stipulated that (1) mitochondrial DNA from the hairs in the hat did not match the Defendant, (2) the DNA results did not exclude Sabrina Lewis' sons or the sons' maternal relatives as donors of the hair, (3) no fingerprint evidence linked the Defendant to the victim's death, and (4) fingerprints recovered from the black vases found at Always Antiques matched Sabrina Lewis.

Upon hearing the foregoing, the jury convicted the Defendant of one count of first degree felony murder and one count of especially aggravated robbery. The tri-

al court sentenced the Defendant to consecutive sentences of life and forty years, respectively. On direct appeal, the Court of Criminal Appeals affirmed the judgments of the trial court. The Defendant sought permission to appeal to this Court. We granted the Defendant's application and now consider two issues: (1) whether the trial court erred in admitting the videotape of the Defendant and Harding while they were in the holding cell; and (2) whether the trial court erred in permitting Officer Smith to testify about Tori Renfro's statements concerning the relationship between the Defendant and Sabrina Lewis.[3] For the reasons set forth below, we affirm the judgment of the Court of Criminal Appeals.

## STANDARD OF REVIEW

■ The admissibility of evidence in Tennessee state trial courts is determined by reference to the Tennessee Rules of Evidence. Tenn. R. Evid. 101. We review for abuse of discretion a trial court's ruling on the admissibility of evidence pursuant to those Rules. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn.1997). A trial court abuses its discretion when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn.1997).

## ANALYSIS

### I. Admission of Videotape

■ The Defendant argues that the trial court erred in permitting the State to play for the jury the videotape of him and

---

**3.** The Defendant set forth two additional issues in his application for permission to appeal: (1) whether the trial court erred in admitting the victim's statements as dying declarations, and (2) whether the evidence is sufficient to support his convictions. The Defendant has since abandoned his appeal of these two issues, and we therefore decline to address them.

Melvin Harding conversing in a jail cell while the Defendant was wearing prison garb. The Defendant alleges that allowing the jury to see him in custody and wearing jail clothes was unfairly prejudicial and, furthermore, unnecessary because the State also had an audiotape of the conversation that it could have played for the jury. He also argues that allowing the jury to see the tape violated his constitutional rights to due process, a fair trial, and the presumption of innocence. The State responds that the videotape was properly admitted and points out that the Defendant has failed to include the audiotape in the record, thereby precluding this Court from determining whether it should have been admitted instead.

Initially, we agree with the State that the Defendant has forfeited his argument that the audiotape should have been admitted instead of the videotape because the Defendant failed to include the audiotape in the appellate record. *See State v. Ballard*, 855 S.W.2d 557, 560–61 (Tenn.1993). Accordingly, we proceed directly to determining whether the trial court abused its discretion in admitting the videotape.

Significantly, the Defendant did not argue to the trial court, and does not argue to this Court, that the recorded conversation between the two men lacks relevance or was otherwise inadmissible. Rather, the Defendant's objection to the videotape lies in its visual portrayal of him while he was in a jail cell and dressed in an inmate's jumpsuit. Defense counsel argued to the trial court that "it would be prejudicial to let the jury see and for the State to parade [the Defendant] around in his jailhouse uniform." The trial court responded that

it was "going to come out that they met each other in jail" and that that fact was "going to be in front of the jury." Defense counsel acknowledged this but contended that it "would be prejudicial to have to re-emphasize that to the jury that he was in jail." The trial court denied defense counsel's request to substitute the audiotape for the videotape.[4]

Our Rules of Evidence provide that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The Defendant argues that the probative value of the videotape was substantially outweighed by the danger of unfair prejudice arising from the jury seeing him incarcerated and dressed as a jail inmate. We respectfully disagree.

By its own terms, Rule 403 requires a weighting of both the probative value of the challenged proof and the danger of unfair prejudice it allegedly presents. As regards the videotape, the trial court determined that its probative value was in assisting the jury to assess Melvin Harding's credibility. We agree with the trial court on this point. In addition to giving the jury the opportunity to hear Mr. Harding's "voice intonations" (as described by the trial court), it gave the jury the opportunity to see and hear how the two men interacted. Mr. Harding's testimony was helpful to the State's case only insofar as the jury believed the Defendant would make a confession to him. The videotape was relevant to establish the level of com-

---

**4.** The trial court denied the Defendant's request to substitute the audiotape for the videotape without first reviewing the audiotape. We agree with the Court of Criminal Appeals' statement that "[i]n light of the video's poten-

tial prejudice to the defense, we are puzzled as to how the trial court could determine that the videotape was the preferable evidence in this case without viewing it or listening to the audiotape."

fort the Defendant felt in conversing with Harding. This Court has watched the videotape and, although the angle of view allows only glimpses of the men's faces and the poor audio quality obscures some of their conversation, the tape nevertheless establishes that the two men appeared to be familiar with and at ease with one another. As regards Harding's credibility, the weight of the videotape's probative value is therefore significant.

As to the weight of any danger of unfair prejudice presented by the videotape, we stress that the jury did not see the videotape until *after* Melvin Harding testified that the Defendant had been in jail with him. Any prejudicial impact stemming from a visual depiction of the Defendant in jail clothing was therefore minimized. The videotape is also brief in length, about seven minutes, and its images of the Defendant in jail attire were countered by the Defendant's appearance wearing street clothes during the three-day trial.[5] We therefore accord little weight to the danger of unfair prejudice presented by the videotape.

■ As noted by our Court of Appeals, "excluding relevant evidence under [Tennessee Rule of Evidence] 403 is an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn.Ct.App.1999) (citations omitted). The Defendant has not carried his burden of persuasion on this point, and we hold that the trial court did not abuse its discretion in refusing to exclude the videotape under Tennessee Rule of Evidence 403 on the grounds that its probative value was substantially outweighed by the danger of unfair prejudice.

■ We turn now to the Defendant's claim that admission of the videotape violated his constitutional rights. The United States Supreme Court has determined that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The Supreme Court reasoned that "an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system," and recognized that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that … an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 504–05, 96 S.Ct. 1691, 48 L.Ed.2d 126.

In this case, however, the Defendant was not tried while dressed in jail attire. Rather, the jury saw a brief videotape of him wearing jail attire. The jury saw the tape after hearing Melvin Harding testify that the Defendant confessed to the instant crimes while they were sharing a jail cell. Thus, as noted above, the jury knew prior to viewing the videotape that the Defendant had been in jail. The tape, as noted above, is less than ten minutes in duration. The trial took place over the course of three days. Under these circumstances, we hold that the trial court did not violate the Defendant's due process rights, nor impair the presumption of innocence, by allowing the jury to view the videotape.

---

**5.** Ms. Fisher identified the Defendant in court and referred to the "brown shirt" he was wearing.

Other courts have reached the same conclusion under similar circumstances. In *State v. Schaller*, 199 Wis.2d 23, 544 N.W.2d 247 (App.1995), the defendant alleged that the verdict was tainted by juror misconduct because some of the jurors had watched television coverage of the trial in which the defendant was depicted in handcuffs and jail clothing. The appellate court rejected the defendant's reliance on *Estelle* and concluded that there was no "reasonable probability that those [ten to fifteen] seconds of videotape coverage would have prejudiced an average jury hearing this four-day trial." *Id.* at 257. In *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593, 645 (1992), overruled on other grounds by *State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717, 729 (2001), the jury was shown videotapes of television broadcasts depicting the defendant in police custody, handcuffed, and wearing jail attire. The defendant argued that these viewings were "tantamount to requiring him to attend his trial in jail garb and handcuffs." *Id.* at 660. The Arizona Supreme Court rejected the defendant's argument, holding that the use of the videotapes did not "emasculate[ ] the presumption of innocence" where the viewings of the defendant were "very brief and were balanced by the presence of the well-groomed, unfettered defendant throughout the lengthy trial." *Id.* at 662. In *Anderson v. State*, 574 So.2d 87 (Fla.1991), the Supreme Court of Florida rejected the defendant's contention that he had been denied a fair trial because the jury was shown a one and one-half minute long videotaped news report that briefly depicted the defendant in jail clothes. *Id.* at 93–94. The court concluded that "[u]nder the circumstances, there was no 'constant reminder of the accused's condition' to support the conclusion that [the defendant] was denied a fair trial." *Id.* at 94 (quoting *Estelle*, 425 U.S. at 504, 96 S.Ct. 1691).

While we caution trial courts that unnecessary displays of a criminal defendant bearing the badges of custody should be avoided, we hold that the brief videotape of the Defendant wearing jail attire in this case did not serve as a "constant reminder" to the jury that the Defendant had been previously jailed and it did not corrupt the presumption of innocence on which the jury was properly instructed. The trial court committed no reversible error in admitting the videotape, and the Defendant is not entitled to relief on this issue.

## II. Admission of Hearsay

Prior to Officer Smith being called to testify, the defense objected on the grounds that his testimony would include inadmissible hearsay.[6] The trial court thereupon conducted a jury-out hearing during which Officer Smith testified that he knew through a family member that the Defendant and Sabrina Lewis were related. When asked by the State about their kinship, Officer Smith responded, "I guess cousins." On cross-examination by defense counsel, Officer Smith explained that his knowledge came from "one particular family member," his half-sister Tori Renfro. Officer Smith explained that Sabrina Lewis and Ms. Renfro were "first cousins." On occasion, Officer Smith would stop at Sabrina Lewis' mother's

---

**6.** The Defendant also complained that the prosecution had not given him adequate notice that it intended to call Officer Smith as a witness. The Defendant continues to raise this point on appeal. The record is unclear as to how much notice the State provided to the defense. We agree with the Court of Criminal Appeals that the Defendant is not entitled to relief on this basis because he has demonstrated no prejudice stemming from the allegedly inadequate notice. *See State v. Hutchison*, 898 S.W.2d 161, 170–71 (Tenn.1994).

house because it was in his "patrol-zone area" and because he would see Ms. Renfro there. If other people were also there, Officer Smith would ask Ms. Renfro who they were. Officer Smith stated that he saw the Defendant there "with a few other guys years ago." Upon his inquiry, Ms. Renfro told him that she was "related to them" and that the Defendant was "her cousin." Defense counsel then asked, "Did [Ms. Renfro] make a statement saying that [the Defendant] was related to Sabrina Lewis?" Officer Smith responded, "She said those were her first cousins, and [the Defendant] was kin to them." Defense counsel pressed, "So do you know exactly how they're related, or do you just know they're cousins?" Officer Smith replied that he did not know, he just knew they were "cousins." The trial court subsequently ruled that Officer Smith could testify about "the reputation concerning personal family history." During his testimony before the jury, Officer Smith acknowledged that Ms. Renfro had told him about the kinship "just once" and that her statement to him had been made three or four years previously. On appeal, the intermediate appellate court determined that the trial court erred in admitting the hearsay but concluded that the error was harmless. The Defendant contends that the trial court's ruling constitutes reversible error.

Of course, Officer Smith's testimony about what Ms. Renfro told him was hearsay. *See* Tenn. R. Evid. 801(c). As such, it was inadmissible unless it met one of the designated hearsay exceptions. *See* Tenn. R. Evid. 802, 803. The State argued successfully at trial, and continues to argue to this Court, that Officer Smith's testimony about what Ms. Renfro told him was admissible pursuant to Tennessee Rule of Evidence 803(19). That Rule provides for the admissibility of hearsay testimony about "[r]eputation among members of a

person's family ... concerning a person's ... relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history." Tenn. R. Evid. 803(19).

■ This Court has not previously addressed Tennessee Rule of Evidence 803(19). The Advisory Commission Comments to Rule 803(19) declare, "[t]he rule admits reputation to prove pedigree, and that is the common law and Tennessee position." Our common law, in turn, provides that "the question of pedigree and ancestry is a matter of common or general reputation ... [and] [t]he matter, from the very nature of things, depends upon reputation or common repute." *Citizens' Rapid–Transit Co. v. Dew,* 100 Tenn. 317, 324, 45 S.W. 790, 791–92 (1898).

In their analysis of Tennessee Rule of Evidence 803(19), the authors of *Tennessee Law of Evidence* state that

> [t]he rule permits reputation evidence to be used to prove various aspects of pedigree, including birth, adoption, relationship, marriage, divorce, and death. This proof is considered sufficiently reliable to be presented to the trier of fact since rarely will general understandings of family and associates about such important matters be wrong.

Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.24[2] (5th ed.2005). The term "general understandings" underscores the basic component of "reputation evidence": knowledge held by more than one person in the relevant community. Simply put, an opinion held by a single person is just that: an opinion. Only if that opinion is held by various members in a community does the opinion become transmuted into a "reputation." "[R]eputation, of course, refers to the collective assessment of a group of people." *Id.*

§ 4.05[3][b] (discussing Tennessee Rule of Evidence 405).

Thus, "[t]he person testifying about this reputation would have to establish that he or she had sufficient familiarity with the reputation to be able to testify about it." *Id.* § 8.24[2]. Accordingly, before hearsay is admissible under Rule 803(19), the trial court must determine whether an adequate foundation has been laid. *See* Tenn. R. Evid. 104(a) ("Preliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court...."). That inquiry requires the trial court to consider the extent of the witness's familiarity with the reputation at issue.

Federal Rule of Evidence 803(19) is virtually identical to Tennessee's and we therefore look to that Rule and its interpretation by the federal courts for further guidance.[7] *See, e.g., State v. Sparks,* 891 S.W.2d 607, 614–15 (Tenn.1995). We first note that the Advisory Committee on the Federal Rules of Evidence noted with respect to Rule 803(19) that

> [t]rustworthiness in reputation evidence is found when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been discussed in the community; and thus the community's conclusion, if any has been formed, is likely to be a trustworthy one.

Fed.R.Evid. 803(19) Advisory Committee Notes (internal quotation marks omitted).

■ As to judicial interpretations, *Blackburn v. United Parcel Service, Inc.,* 179 F.3d 81 (3d Cir.1999), appears to be

the seminal decision on Federal Rule of Evidence 803(19). In that case, the Court of Appeals for the Third Circuit first noted that "reputations regarding relationships and other personal and family matters within a well-defined community are considered to have the circumstantial guarantee of trustworthiness that justifies a hearsay exception." *Blackburn,* 179 F.3d at 98–99. In seeking to explicate the term "reputation," the court looked to commentary on the similar hearsay exception for reputation concerning boundaries or general history:[8] "[t]he testimony must report a general consensus in the community, an assertion of the group as opposed to one or a few of its constituents. The fact that the information has been considered by and was subject to the general scrutiny of the community is an essential guarantee of reliability for the exception." *Id.* at 100 (quoting 3 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* 1699 (7th ed.1998)). The court continued:

> [T]he principle behind admitting such evidence despite its hearsay origin ... requires that a proponent of Rule 803(19) evidence establish that the reputation testimony arises from sufficient inquiry and discussion among persons with personal knowledge of the matter to constitute a trustworthy "reputation." Rumors and speculation are clearly insufficient in this regard. Testimony by a declarant that he heard, from some unknown source, that two people were related in some way would be inadmissible under Rule 803(19). Rather, what is required is the laying of a foundation of knowledge grounded in inquiry, discus-

---

**7.** Federal Rule of Evidence 803(19) provides that "[r]eputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitima-

cy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history" is not excluded by the hearsay rule.

**8.** *See* Fed.R.Evid. 803(20).

sion, interactions, or familiarity "among a person's associates, or in the community" . . . which he [inhabits].

*Id.* at 99–100. Therefore, the court determined, only "when a matter has been sufficiently discussed within a well-defined community so that its truth has obtained 'circumstantial guarantees of trustworthiness' . . . [is it] properly the subject of reputation testimony." *Id.* at 100. Based on these principles, the court formulated the necessary foundational inquiry:

A witness who wishes to testify about someone's reputation within a community must demonstrate that he or she knows of the person and is truly familiar with the "community" in which the reputation has been formed, and that the basis of the reputation is one that is likely to be reliable. Where the alleged reputation is based on nothing more than rumors of unknown origins, or a single instance of "someone told me so," a proper foundation has not been laid for admitting such evidence under Rule 803(19).

*Id.* at 101. *See also United States v. Brodie,* 326 F.Supp.2d 83, 97–98 (D.D.C.2004) (holding that one defendant's statements about other defendants' relationships were not admissible under Federal Rule of Evidence 803(19) for lack of appropriate foundation where basis for first defendant's alleged knowledge was not established); *United States v. Lyons Capital, Inc.,* No. 99–4178, 2000 WL 1792985, at *6–7 (4th Cir. Dec. 7, 2000) (holding that proffered witness's testimony that one of his employees told him that a party was a baron was not admissible under Federal Rule of Evidence 803(19) because "no record evidence demonstrates that the editor's information was based on [the party's] 'reputation . . .

in the community,' " and that "[e]ven if the defense had offered proof that the editor's testimony stated facts based on [the party's] 'reputation . . . in the community' it was inadmissible" under 803(19) because "[t]he defense offered no evidence that [the party] had a *trustworthy* reputation in his community as a baron, or otherwise").

Other state court rulings on their similar rules of evidence are also helpful. For instance, in *State v. May,* 210 Ariz. 452, 112 P.3d 39 (App.2005), a police officer pulled May over because May was driving over the speed limit. In the car with May were an adult female and a minor male. While the officer was investigating May for driving while intoxicated, an adult male arrived and told the officer that the minor male passenger was his thirteen-year-old son. May was subsequently convicted of aggravated driving under the influence of an intoxicant while a person under fifteen years of age was in the vehicle. The only proof of the minor male's age was the police officer's testimony about what the adult male had told him at the scene.

On appeal, May contended that the trial court had erred in allowing the officer to testify, pursuant to Arizona Rule of Evidence 803(19),[9] about the minor male passenger's age. Relying on *Blackburn,* the appellate court agreed. After first pointing out that the hearsay at issue was the "putative father's statement to the officer," 112 P.3d at 44, the court determined that the prosecution had failed to establish an adequate foundation for the officer's testimony about what the putative father told him:

The record does not reflect sufficient "inquiry, discussion, interactions, or familiarity" between the officer[ ] and the

---

**9.** Arizona's Rule of Evidence 803(19) is identical to Federal Rule of Evidence 803(19). *See* Ariz. R. Evid. 803(19).

putative father. The father and son met the arresting officer for the first time at the scene of a DUI investigation. The father claimed to be May's brother, gave the officer the age and date of birth of the minor passenger, and left without showing any identification. The officer was not an associate of either the father or son or a member of their "community" for purposes of Rule 803(19).

Under these circumstances, admitting the statement pursuant to that rule was contrary to its purpose. Testimony of personal or family history is generally admissible because it is believed that "constant (though casual) mention and discussion of important family affairs" allow other members of the family, community, or associates to "know, as well as anyone can be expected to know, the facts of the matter." Here, the putative father's statement to the officer was not constant and, therefore, was not necessarily reliable. As May correctly points out, "the State called a police officer to repeat what an alleged family member told him about the juvenile's age."

Accordingly, the trial court erred in admitting the officer's testimony pursuant to Rule 803(19) because there was insufficient foundation establishing he was an associate of the male passenger or putative father or member of their community. The officer's testimony was hearsay, not excepted by Rule 803(19) or admissible under any other rule.

*Id.* at 44–45 (citations and footnote omitted). *See also Lacy v. Lacy,* 922 S.W.2d 195, 198 (Tex.Ct.App.1995) (stating with regard to Texas Rule of Civil Evidence 803(19) "[a] witness who testifies to reputation testifies to his generalized memory of a series of out-of-court statements. Hence, the trustworthiness of the informa-

tion offered depends on the value of the veracity of the collective asserters of the information."); *Moore v. Goode,* 180 W.Va. 78, 375 S.E.2d 549, 563–64 (1988) (holding testimony of family history by reputation is permitted under West Virginia Rule of Evidence 803(19) but party's testimony about specific statements of her paternity made by family members must meet requirements of West Virginia Rule of Evidence 804(b)(4)); *In re Estate of Borowy,* No. 249775, 2004 WL 2952555, at *1 (Mich. Ct.App. Dec. 21, 2004) (holding decedent's statements to third parties regarding his paternity of appellee were inadmissible under Michigan Rule of Evidence 803(19) "because they did not pertain to a 'reputation' concerning the decedent's blood-relationship among members of a designated group"); *cf. State v. Dudley,* 2007 WL 313307, at *2 (N.J.Super.Ct.App.Div. Feb.5, 2007) (witness properly permitted to testify about person's nickname pursuant to New Jersey Rule of Evidence 803(c)(19) where source of witness' knowledge was formal statements from four individuals who had known person for at least three months).

We conclude that, before a witness is allowed to testify about another person's reputation for familial relationships pursuant to Tennessee Rule of Evidence 803(19), the trial court must be satisfied that the witness is going to testify about a *reputation* and not merely a single interpretation of an alleged reputation. In this case, Officer Smith was not sufficiently familiar with the Defendant's community or with the Defendant's reputation for familial relationships because he spoke on only a single occasion and with only one other person about it, albeit someone who claimed a familial relationship with the Defendant.[10] Had the State called Tori

---

**10.** We note that, although Officer Smith testi-   fied that Tori Renfro was his half-sister, he

Renfro, she may have been able to establish sufficient familiarity with the Defendant's community and reputation to meet the foundational requirements of Tennessee Rule of Evidence 803(19). Ms. Renfro apparently spent considerable time in the Defendant's community and could have answered preliminary questions about the number of times she had heard the Defendant referred to as Sabrina Lewis' cousin as well as the number of people in the Defendant's community so referring to him. In short, Ms. Renfro may have been able to establish the crucial trustworthiness of the reputation with which she was allegedly familiar. Officer Smith could not.

In this case, Officer Smith was repeating a single statement made to him by his half-sister, a putative member of the Defendant's family. Officer Smith did not claim any other knowledge about or familiarity with the Defendant's familial relations. As was the case in *May*, the State here called a police officer to repeat what an alleged family member of the Defendant told him about the Defendant's kinship with Sabrina Lewis.

We acknowledge, of course, that Officer Smith had greater familiarity with the declarant, Tori Renfro, in this case than did the police officer with the minor passenger's putative father in *May*. Nevertheless, the principle is the same. In each case, the witness was testifying about what another person told him on a single occasion about a third person's alleged reputation. In each case the testifying witness had no personal familiarity with the reputation at issue. In each case, there was insufficient foundation for the admission of the disputed hearsay pursuant to Rule of Evidence 803(19).

We hold, therefore, that the trial court erred when it allowed Officer Smith to testify about what Tori Renfro had told him about the Defendant's kinship with Sabrina Lewis. We hold that the error was harmless, however. Harding testified that the Defendant confessed to having committed these crimes. Ms. Fisher placed the Defendant at the scene of the crimes. This proof was sufficient to support the jury's verdict of the Defendant's guilt of these crimes. Officer Smith's testimony was not necessary to a finding of the Defendant's guilt. Rather, it made a minor contribution to the wealth of circumstantial evidence linking the Defendant to Sabrina Lewis and her participation in these crimes. Considering the record as a whole, the trial court's erroneous admission of the hearsay does not affirmatively appear to have affected the result of the trial on the merits and the Defendant is therefore entitled to no relief on this basis. *See* Tenn. R.Crim. P. 52(a); Tenn. R.App. P. 36(b).

## CONCLUSION

The trial court did not err in allowing the jury to view the videotape in which the Defendant appeared dressed in jail attire. While the trial court erred in allowing Officer Smith to testify under Tennessee Rule of Evidence 803(19), the error was harmless. The Defendant being entitled to no relief on the grounds alleged, we affirm the judgment of the Court of Criminal Appeals.

It appearing that the Defendant is indigent, the costs of this cause are taxed to the State of Tennessee.

disavowed any relationship with the Defen-    dant.