**[J-2-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 17 WAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered January 14, |
| | : | 2021 at No. 200 WDA 2020, |
| v. | : | affirming in part and reversing in |
| | : | part the Judgment of Sentence of |
| | : | the Court of Common Pleas of |
| DERRICK GALLAWAY, | : | Allegheny County entered |
| | : | November 25, 2019 at No. CP-02- |
| Appellant | : | CR-0001824-2018. |
| | : | |
| | : | ARGUED:  April 13, 2022 |

## OPINION

**JUSTICE TODD**                    **DECIDED: SEPTEMBER 29, 2022**

In this appeal by allowance, we consider whether the Superior Court's determination that the probative value of videotape evidence which showed Appellant Derrick Gallaway in prison clothing outweighed its prejudicial effect, such that admission of the evidence did not deprive Appellant of a fair trial under *Estelle v. Williams*, 425 U.S. 501 (1976) (an accused cannot be compelled to stand trial before a jury while dressed in identifiable prison clothing).  For the reasons set forth below, we hold that the probative value of the evidence was not outweighed by its prejudicial effect, and, thus, we affirm Appellant's judgment of sentence.

On the morning of May 27, 2016, the body of Denhad Taiedi (hereinafter, "the Victim"), who owned the Jefferson Hills Motel (hereinafter, "motel") in Allegheny County, Pennsylvania, was discovered in the motel's office with a fatal gunshot wound to the head.

The office was in disarray, a cash box and bank bag were found to have been mostly emptied of money, and the security camera had been ripped from the wall. Blood stains were found on a tray inside the cash box, inside the bank bag, and on the office door, and a trail of fresh blood drops led from the motel office to the parking lot. Testing of the blood revealed that it matched Appellant's DNA, and, on August 26, 2016, a warrant was issued for his arrest. When officers were unable to locate Appellant at any of his known addresses, his information was entered into the National Crime Information Center ("NCIC"). More than a year later, on November 13, 2017, Appellant was arrested in Carmichael, California, and he was extradited to Pennsylvania on or around December 13, 2017.

On December 13, 2017, Appellant was interviewed by two Allegheny County Police Detectives concerning the Victim's murder. During the interview, which took place at the county police headquarters and was videotaped, Appellant wore bright red prison-issued clothing. When questioned by the detectives, Appellant, who had waived his *Miranda* rights, denied ever having stayed at the motel, and denied being at the motel in 2016. Appellant further denied ever meeting Shawn Urcini and Danielle Walker,[1] individuals with whom Appellant was alleged to have associated at the motel, and, with respect to Urcini, was alleged to have discussed robbing the motel.

At Appellant's trial, the Commonwealth presented, *inter alia*, the testimony of Julan Seidel, a motel guest, who stated that she was at the motel on the night before the Victim's body was discovered and encountered Appellant near one of the motel's vending machines. She testified that she observed Appellant talking with Urcini, and overheard them say "something along the lines of they were about to get money that night, like we're about to get this money." N.T. Trial, 8/28/19, at 214. Additionally, the Commonwealth

---

[1] Both Urcini and Walker died in 2017, prior to trial.

presented the testimony of Charles Wright, who testified that he met Appellant in 2015 when Walker brought Appellant to Wright's house to purchase drugs. N.T. Trial, 8/29/19, at 422-24.

The Commonwealth also presented the testimony of Nicole Stercula and Linda Holliday, who worked as office clerks at the motel. Both women testified that Appellant had been a resident of the motel for approximately one month or more in late 2015, until he was evicted following an altercation with the Victim. The women also testified that they had seen Appellant spend time with Walker, who was Urcini's girlfriend. Further, they testified that the Victim had tried to help Walker by allowing her to stay in his office, which gave Walker access to the motel's master key, and by giving her money. N.T. Trial, 8/28/19, at 263-67; N.T. Trial, 8/30/19, at 509. Stercula further testified that, approximately one week prior to the Victim's death, Walker had come to the motel and demanded more money from the Victim, but he refused. N.T. Trial, 8/28/19, at 267.

On the third and final day of trial, the Commonwealth sought and was granted permission to play for the jury an edited version of Appellant's videotaped interview by the police detectives.[2] The edited version of the videotaped interview (hereinafter, "videotape") was approximately 17 minutes long, and, as noted above, clearly showed Appellant in bright red prison clothing throughout. The Commonwealth asserted that the videotape evidenced Appellant's consciousness of guilt, as it showed him making false statements to police regarding, *inter alia*, whether he was in Pittsburgh at the time the Victim was killed, whether he had ever stayed at the motel, and whether he knew Urcini or Walker.

Defense counsel objected to the admission of the videotape on the basis that it would prejudice Appellant in the eyes of the jury because it would allow the jury to observe

---

[2] The videotape had been edited to exclude a prejudicial statement made by Appellant, as well as a heated exchange between Appellant and the detectives.

him in prison clothing. Notably, throughout the trial, Appellant wore a suit in the courtroom. The trial court overruled the objection, stating, "[t]his is not the only case where a defendant, a suspect is interviewed in their jail reds." N.T. Trial, 8/29/19, at 276.[3] The court offered to give a cautionary instruction to the jury, but defense counsel declined the offer.

After the videotape was played for the jury, Appellant took the stand in his own defense. Contrary to the statements he made during the interview, Appellant testified that, on the night the Victim was killed, he was in the parking lot of the motel with a prostitute when he heard two or three gunshots. N.T. Trial, 8/30/19, at 631-33. He explained that, upon hearing the gunshots, he ducked down and cut his finger on the jagged edge of the prostitute's crackpipe. *Id.* at 633-34. Appellant stated that he then saw an individual, whom he thought may have been Urcini, walk past the car in which he was sitting. *Id.* at 662. Thereafter, Appellant walked into the motel lobby because he "was curious," and saw the Victim's body. *Id.* at 635. According to Appellant, he began to look around for a phone, but did not find one, so he left without attempting to contact police or anyone else. *Id.* at 635-36. Appellant also admitted that he may have stayed at the motel for two consecutive days, but insisted that the motel clerks were lying when they testified that he had stayed for a longer period. *Id.* at 645.

Additionally, Appellant denied ever meeting Wright or going to his house. *Id.* at 640. When asked if he knew Walker, Appellant stated that "there was a girl there the first time I checked in, but I don't recall if her name was Danielle." *Id.* at 638. When asked if he ever had a conversation with Urcini, Appellant stated that he never had a conversation with him, but that he may have spoken to him "casually" in the doorway of his motel room

---

[3] "Jail reds" refers to prison-issued clothing.

or near the motel's vending machine, as he "might have come to get a cigarette or something." *Id.* at 639.

The jury convicted Appellant of first-degree murder,[4] robbery,[5] theft by unlawful taking,[6] and tampering with physical evidence.[7] The trial court sentenced Appellant to life imprisonment, followed by a term of incarceration of 10-20 years.

Appellant appealed his judgment of sentence to the Superior Court, challenging the trial court's admission of the videotape, as well as the sufficiency of the evidence of the crime of tampering with evidence. Appellant claimed, *inter alia*, that the probative value of the videotape was outweighed by the danger of unfair prejudice, as it showed him in prison clothing, and thereby "prejudiced his presumption of innocence in the eyes of the jury." *Commonwealth v. Gallaway*, 2021 WL 129718, *3 (Pa. Super. filed Jan. 14, 2021). In a memorandum opinion, the Superior Court reversed Appellant's conviction for tampering with physical evidence, but affirmed his remaining convictions.[8]

The Superior Court recognized that, pursuant to *Estelle*, a defendant cannot be compelled to attend trial in identifiable prison clothing because of the "possible impairment of the presumption [of innocence] so basic to the adversary system." *Id.* at *4 (quoting *Estelle*, 425 U.S. at 504). The Superior Court further acknowledged that the prohibition against forcing a defendant to attend trial in identifiable prison clothing "is based primarily upon the impact that the 'constant reminder of the accused's condition implicit in such

---

[4] 18 Pa.C.S. § 2502(a).

[5] *Id.* § 3701(a)(1)(i).

[6] *Id.* § 3921.

[7] *Id.* § 4910(1).

[8] Although Appellant filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), the trial judge resigned prior to preparing an opinion pursuant to Pa.R.A.P. 1925(a). However, the Superior Court determined that it could review Appellant's claims based on the existing record.

distinctive, identifiable attire' might have upon the jury." *Id.* (quoting *Estelle*, 425 U.S. at 504-05). Finally, the court cited its own decision in *Commonwealth v. Keeler*, 264 A.2d 407 (Pa. Super. 1970) (*en banc*), wherein the court held that the defendant, who first appeared before the jury during jury selection wearing his prison uniform, was entitled to a new trial.

The Superior Court concluded, however, that *Estelle* and *Keeler* did not afford Appellant relief:

> [R]egarding Appellant's assertion that he was entitled to enter the courtroom with the presumption of innocence, Appellant admits that he was in fact wearing civilian clothes throughout the duration of the trial. The subject video was played on the third day of trial at the conclusion of the Commonwealth's case-in-chief. At this point, the jury already received considerable testamentary and physical evidence connecting Appellant to the crimes. This is not the same as the situation[] in *Keeler* . . . wherein the defendant was introduced to the jury pool wearing prison attire. Nor, as in *Estelle*, was Appellant's brief appearance in prison attire in a video a constant reminder to the jury of his condition of incarceration. The duration of the video was less than twenty minutes.

*Gallaway*, 2021 WL 129718, at *4 (citation omitted).

The court further determined that the videotape's probative value outweighed any prejudicial effect, as evidence of Appellant's false statements to the detectives "was extremely probative of Appellant's consciousness of guilt." *Id.* at *5. Additionally, the court concluded that, because there was testimony regarding the attempts by police to locate Appellant, and his eventual extradition from California to Pennsylvania, "it was clearly reasonable for the jury to infer that Appellant was incarcerated" for the Victim's murder. *Id.*

Appellant filed a petition for allowance of appeal with this Court, and we granted review to consider whether the Superior Court's holding that the probative value of the videotape outweighed its prejudicial effect, and, thus, that Appellant was not deprived of

a fair trial, conflicts with the United States Supreme Court's decision in *Estelle* and the Superior Court's *en banc* decision in *Keeler*.

Preliminarily, it is axiomatic that the admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019). An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. *Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021).

To be admissible, evidence must be relevant. Pa.R.E. 402. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. *Talley*, 265 A.3d at 530. Pertinent herein, a defendant's omissions and lies in statements to police are relevant as evidence of consciousness of guilt. *Commonwealth v. Murphy*, 134 A.3d 1034, 1040 (Pa. 2016). However, a trial court may exclude relevant evidence if its probative value is outweighed by a danger of, among other things, unfair prejudice. Pa.R.E. 403. "Unfair prejudice" is "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, Comment. In determining whether evidence should be admitted, a trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. *Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002).

Before this Court, Appellant maintains that the Superior Court erred in concluding that the probative value of the videotape was outweighed by the danger of unfair prejudice because it allowed the jury to view him in prison clothing. Specifically, he contends that the Superior Court improperly found *Estelle* and *Keeler* distinguishable from the instant

case, because, in his view, the jury's observation of the videotape showing him in prison clothing "was no less damaging" to his right to a fair trial than if he had been forced to wear prison clothing at trial. Appellant's Brief at 16 n.5.

Further, with regard to the Superior Court's finding that the probative value of the videotape outweighed the danger of unfair prejudice because it was evidence that Appellant made false statements, demonstrating his consciousness of guilt, Appellant asserts that the Superior Court's analysis was "somewhat incomplete and dismissive of the needlessly prejudicial import of this visual evidence." *Id.* at 29. Appellant claims there was no recognition by the Superior Court that the Commonwealth could have played only the audio of the videotaped interview, or that it could have questioned the detectives about Appellant's false statements, alternatives which would have allowed the Commonwealth to introduce evidence of Appellant's consciousness of guilt without prejudicing him by allowing the jury to view him in prison clothing.

Appellant also contends that the Superior Court's finding that he was not prejudiced by the videotape because it was played at the end of the Commonwealth's case, at which time the jury had already heard evidence of his guilt, creates a loophole allowing the Commonwealth to show a defendant in prison attire provided it is done "strategically, under the assumption [the Commonwealth] has already presented overwhelming evidence of guilt." *Id.* at 26. Moreover, Appellant argues that allowing a jury to view a defendant in prison clothing after other evidence has been introduced will improperly affect the jury's assessment of both previously introduced evidence, as well as any evidence that follows − in this case, Appellant's own testimony.

Finally, with respect to the Superior Court's determination that, based on the references at trial to Appellant's arrest, it was reasonable for the jury to infer that he wore prison clothing in the videotaped interview because the interview occurred after he was

arrested in California and extradited to Pennsylvania, Appellant argues that this logic presumes that jurors are knowledgeable about the extradition process, or, alternatively, suggests that a large percentage of arrests on criminal charges result in incarceration. He submits that the theory that a jury reasonably may presume that a defendant, following arrest, remains incarcerated while awaiting trial undermines the rationale of *Estelle*, in that such presumption will, like forcing a defendant to wear prison clothing during his trial, serve as a "constant reminder" of the defendant's incarceration, resulting in an unfair trial. *Id.* at 32.

In response, the Commonwealth contends that the Superior Court properly affirmed Appellant's judgment of sentence, as it correctly determined that the probative value of the videotape in demonstrating Appellant's consciousness of guilt outweighed any danger of unfair prejudice to Appellant, particularly since the videotape was only 17 minutes long, as compared to the totality of the Commonwealth's case-in-chief, which took the greater part of three days to present.

The Commonwealth further challenges Appellant's reliance on *Estelle* and *Keeler*, noting that, in those cases, the defendants were "compelled to wear jail garb when personally appearing before the jury in court, whereas here [A]ppellant was only seen in a short audio/video recording made in a neutral location away from the courthouse." Commonwealth's Brief at 37. The Commonwealth also highlights that *Estelle* did not involve an issue of the admission of evidence, and, therefore, the Court in *Estelle* did not address the proper balance between the potential prejudice and the probative value of the proffered evidence; rather, it simply "established the overarching principle that a jury's impartiality may be compromised when the defendant appears personally before them in a jail uniform." *Id.* at 39.

The Commonwealth points out that several of our sister states have held that a trial court's admission of a videotape which shows a defendant in prison clothing or handcuffs does not undermine the defendant's presumption of innocence to the same extent as when a similarly-attired defendant is compelled to appear before the jury in person. In the Commonwealth's view, such a distinction is supported by *Estelle's* "concern that a prisoner attending trial in prison clothing could serve as a 'constant reminder' to the jury that the accused is incarcerated." *Id.* at 42.

Finally, the Commonwealth disputes any suggestion by Appellant that the videotape showing Appellant in prison clothing constituted improper "other crimes" evidence. *Id.* at 43. In this regard, the Commonwealth reiterates the Superior Court's observation that the jury was informed at trial that, after blood evidence at the scene was determined to match Appellant's DNA, a warrant was issued for Appellant's arrest, and he eventually was apprehended in California and extradited to Pennsylvania, whereupon he was interviewed by police regarding the murder. As a result, the Commonwealth submits that it was clear to the jury the videotaped interview related only to the murder of the Victim, and not to any prior crime. *Id.* at 46.

The Fourteenth Amendment guarantees a defendant the right to a fair trial, a basic component of which is the presumption of innocence in favor of the accused. *See Estelle*, 425 U.S. at 503 ("[t]he right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment. The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (citation omitted)); *Deck v. Missouri,* 544 U.S. 622, 630 (2005) (explaining that "the criminal process presumes that the defendant is innocent until proven guilty").

Further, it is understood that a defendant's clothing may impact that presumption. In *Estelle*, the defendant was charged with assault with intent to commit murder. On the

morning of trial, the defendant asked a corrections officer at the jail for his civilian clothes, but his request was denied. Thus, for the entirety of his trial, the defendant wore clothing distinctly labeled as prison-issued, and neither the defendant, nor his counsel, lodged an objection. Following his conviction, the defendant appealed to the Texas Court of Appeals, which affirmed his judgment of sentence. The defendant sought *habeas* relief in federal court. Although the district court held that it was inherently unfair to require a defendant to stand trial in prison clothing, it denied the defendant relief, finding that the error was harmless. On further appeal, the Fifth Circuit Court of Appeals reversed, concluding the error was not harmless.

On grant of *certiorari*, the high Court instructed that, in order to "implement" the defendant's presumption of innocence,

> courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny. Courts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.

*Estelle*, 425 U.S. at 503-04 (citations omitted).

The Court then noted the general consensus among courts that "an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption so basic to the adversary system." *Id.* at 504. In this regard, the *Estelle* Court specifically recognized the Pennsylvania Superior Court's decision in *Keeler*, wherein that court opined: "[a] defendant in prison garb gives the appearance of one whom the state regards as deserving to be so attired. It brands him

as convicted in the state's eyes. It insinuates that the defendant has been arrested not only on the charge being tried but also on other charges for which he is being incarcerated." *Keeler*, 264 A.2d at 409.[9]

The *Estelle* Court further highlighted that, in disapproving the practice of forcing an accused to go to trial in prison clothing, the American Bar Association's Standards for Criminal Justice recognized that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment. The defendant's clothing is so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Estelle*, 425 U.S. at 504-05.

Thus, the high Court cautioned that an accused should not be compelled to go to trial in prison clothing "because of the possible impairment of the presumption so basic to

---

[9] In *Keeler*, the defendant was charged with violations of the Uniform Firearms Act. On the morning the public defender was notified that the defendant needed to be ready for trial, the defendant was in the county jail, wearing a uniform supplied by the diagnostic clinic from which he was transferred the previous evening. The public defender attempted to secure civilian clothing for the defendant by contacting the defendant's sister. At the time trial was set to commence, the clothing had not yet arrived, and counsel moved for a continuance, which was denied. As a result, during *voir dire*, the defendant appeared before the jury in the clinic uniform for approximately 35 minutes, at which time his civilian clothes arrived and he was permitted to change his attire. The defendant moved to disqualify the jury before it was sworn in, but the trial court denied the motion, and the defendant was convicted of the charges against him.

On appeal, an *en banc* panel of the Superior Court vacated his judgment of sentence and ordered a new trial. It concluded that the trial court abused its discretion in refusing to continue the defendant's trial until civilian clothes were procured, explaining that forcing a defendant to appear in the courtroom in prison clothing not only "gives the appearance of one whom the state regards as deserving to be so attired" and suggests that the defendant has been arrested on charges other than those for which he is on trial, but doing so "demeans the defendant in his own mind. It makes him feel that, although presumed to be innocent, he has already lost his dignity by the very fact of arrest and charge," placing him "in a psychological, emotional disadvantage." *Keeler*, 264 A.2d at 409.

the adversary system." *Id.* at 504. It further opined that "compelling an accused to wear jail clothing furthers no essential state policy. That it may be more convenient for jail administrators, a factor quite unlike the substantial need to impose physical restraints upon contumacious defendants, provides no justification for the practice." *Id.* at 505.[10]

Notwithstanding the above, the Court in *Estelle* noted that courts generally have declined to adopt a *per se* rule invalidating all convictions where a defendant had appeared in identifiable prison clothing, and instead applied the harmless error doctrine. Finding that the defendant's failure to object to being tried in prison clothing was sufficient to negate the presence of compulsion necessary to establish a constitutional violation, the *Estelle* Court reversed the judgment of the court of appeals. *Id.* at 512-13.

This Court likewise has recognized that the Fourteenth Amendment prohibits a state from compelling an accused to wear prison clothing during his trial. In *Commonwealth v. Cox,* 983 A.2d 666 (Pa. 2009), the appellant, who was charged with, *inter alia*, murder, appeared in court on the first day of *voir dire* wearing prison clothing. The trial court made note of the appellant's attire, and the prosecutor advised the court that it would introduce evidence that the appellant had contacted authorities while he was in prison, thus explaining his attire. Only two jurors were selected that day, and the appellant wore civilian clothes for the remainder of the jury selection and trial. The appellant was convicted, and in a subsequent post-conviction petition for relief the appellant argued that his prior counsel were ineffective for failing to ensure he had civilian clothing for the first day of trial, for failing to file a motion to recuse the two jurors who had observed him in prison clothing, and for failing to litigate the claim.

_____

[10] In *Deck*, *supra,* the Court explained that a defendant may not be forced to appear in court during the guilt or penalty phase of his trial while visibly shackled in leg irons, handcuffs, or belly chains, absent a justifiable essential state interest, such as maintaining security or preventing escape. *Deck*, 544 U.S. at 624.

In concluding that the appellant was not entitled to relief, we acknowledged the high Court's holding in *Estelle* that the Fourteenth Amendment prohibits a state from compelling an accused to wear prison clothing during his trial. *Id.* at 691. We noted, however, that there was nothing in the record that demonstrated that the appellant was *compelled* to wear prison attire on the first day of jury selection. Moreover, we observed that, because the appellant alleged ineffectiveness of counsel, he was required to establish prejudice, which he failed to do, as the jury heard evidence that appellant was incarcerated when he contacted authorities, and the evidence of his guilt was overwhelming.[11]

Further, we have consistently interpreted the holding in *Estelle* to be based on the concern that compelling an accused to go to trial in prison clothing will serve as a "constant reminder of the accused's condition implicit in such distinctive, identifiable attire," and the potential impact this might have on the jury. *Estelle*, 425 U.S. at 504-05. For example, in *Commonwealth v. Johnson*, 838 A.2d 663 (Pa. 2003), the appellant was charged in Pennsylvania with homicide and related offenses, and a warrant was issued for his arrest. He eventually was arrested in New York. At trial, one of the Commonwealth's witnesses testified regarding statements made to him and another individual by the appellant while the three men were incarcerated. The appellant was convicted and sentenced to death. On appeal to this Court, he argued, *inter alia*, that the

---

[11] In *Commonwealth v. Baker*, 511 A.2d 777 (Pa. 1986), this Court held that the trial court did not abuse its discretion in refusing to grant a mistrial after the appellant appeared in prison clothing during selection of the first five jurors. In so holding, we recognized that "[t]he law is clear that a state cannot, consistent with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothing." *Id.* at 784. However, we observed that the trial court "did not order Appellant to stand trial in prison garb," and the appellant "was afforded every opportunity to wear civilian clothing during the trial." *Id.* Moreover, we noted that the trial judge had found that the garments appellant wore were "not readily identifiable as prison clothing," and, thus, the appellant "suffered no prejudice as a result of the clothing he was wearing." *Id.*

trial court erred in allowing the Commonwealth's witness to testify regarding his encounter with the appellant in prison because that testimony "informed the jury that he was incarcerated, thereby prejudicing him in the eyes of the jurors." *Id.* at 680.

In rejecting his claim, we explained that, "although generally no reference may be made at trial to a defendant's arrest or incarceration for a previous crime, there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Id.* (citations omitted). We further noted that, "although the Court has disapproved forcing a defendant, who was incarcerated prior to trial, to attend trial in identifiable prison clothing, this prohibition is based primarily upon the impact that the 'constant reminder of the accused's condition implicit in such distinctive, identifiable attire' might have upon the jury." *Id.* at 680-81 (quoting *Estelle*). We held that "the reference to Johnson's incarcerated status was passing, and not the type of 'constant reminder' proscribed by *Estelle*." *Id.* at 681.

Further, in *Commonwealth v. Moore*, 633 A.2d 1119 (Pa. 1993), the appellant was injured during a riot at the prison where he was incarcerated prior to trial. In response to media reports suggesting he was involved in instigating the riot, he moved for a mistrial. The trial court denied the mistrial, but because the appellant had a bandage on his head when he appeared for trial, the trial court, over the appellant's objection, issued an instruction to the jury that it should not consider his appearance, or any media reports as to how he may have been injured, in its deliberations. Before this Court, the appellant argued that the contents of the instruction, together with his appearance, impermissibly "cloaked him as a prisoner" in violation of *Estelle*. *Id.* at 1127. In rejecting his claim, we first observed that the high Court in *Estelle* was concerned "that the defendant[']s appearance would be a *constant reminder* of the accused's condition that might have significant effect on the jury's feeling about the defendant, without serving any essential

state policy." *Id.* (emphasis original). Additionally, while recognizing that "the curative instruction by the trial court . . . together with appellant's appearance at trial had the effect of informing the jury that appellant was a prisoner and may have been injured while incarcerated," *id.*, we determined that this factor did not rise to the level of error proscribed in *Estelle*:

> There is nothing in the record to indicate that appellant was compelled to wear prison attire, nor that the jury was aware that appellant was clothed in prison attire. Furthermore, appellant fails to establish that the clothing was marked or identified as prison attire. Moreover, even if we were convinced that appellant had been improperly cloaked as a prisoner by the trial court's curative instruction combined with his appearance at trial, we conclude that such error would be harmless.

*Id.* at 1127-28 (footnote omitted).

It is established, therefore, that a defendant cannot be compelled to stand trial in prison clothing. However, neither this Court, nor the United States Supreme Court, has considered whether a jury's observation of a videotape in which the defendant is wearing prison clothing carries the same risk to his presumption of innocence as the jury's in-person observation of the defendant in prison clothing at trial. This Court also has not considered the impact of a videotape showing a defendant in prison clothing in the context of balancing the probative value of evidence against the danger of unfair prejudice under Rule 403. However, as both Appellant and the Commonwealth observe, a number of our sister states have addressed these issues.

In *State v. Taylor*, 240 S.W.3d 789 (Tenn. 2007), for example, the appellant appealed his judgment of sentence for first-degree murder, alleging that the trial court erred in allowing the prosecutor to play for the jury a seven-minute videotape of a conversation between the appellant and his cellmate when the appellant was incarcerated for an unrelated crime. On the videotape, the appellant, who was wearing prison clothing,

admitted to the crime for which he was currently on trial.  The appellant claimed that the admission of the videotape violated his constitutional right to the presumption of innocence and a fair trial, as recognized in *Estelle*.  He further argued that the videotape was unfairly prejudicial, and unnecessary, because the State had an audio-only version of the tape which defense counsel requested be played instead, but the trial court denied the request.

The Tennessee Supreme Court first determined that, under its rules of evidence, which permit relevant evidence to be excluded if its probative value is substantially outweighed by, *inter alia*, "the danger of unfair prejudice, confusion of the issues, or misleading the jury," the probative value of the videotape in demonstrating the cellmate's credibility as a witness was not outweighed by the danger of unfair prejudice, as the jury did not see the videotape until after the witness testified that he and the appellant had been in jail together.  *Id.* at 795, 798.  The court also found that the videotaped images of the appellant in prison clothing were "countered by [his] appearance wearing street clothes during the three-day trial."  *Id.* at 796.

Regarding the appellant's claim that the admission of the videotape was improper under *Estelle*, the court reasoned that, under the circumstances of the case – including that the appellant was not tried in jail clothing; the jury saw the videotape after it heard the witness testify that the appellant confessed to him while they shared a jail cell; the videotape was less than ten minutes long; and the trial took place over three days – "the trial court did not violate the [appellant's] due process rights, nor impair the presumption of innocence, by allowing the jury to view the videotape."  *Id.*  Noting that "[o]ther courts have reached the same conclusion under similar circumstances," the court concluded that the videotape "did not serve as a 'constant reminder' to the jury that the [appellant] had

been previously jailed and it did not corrupt the presumption of innocence on which the jury was properly instructed." *Id.* at 797.

In *Ritchie v. State*, 875 N.E.2d 706 (Ind. 2007), a case cited by the Commonwealth herein, the appellant, following his conviction for murder and related offenses, asserted in a post-conviction petition for relief that his trial counsel provided ineffective assistance by failing to move to suppress a videotape of his pretrial interviews with the news media during which the appellant was shackled and dressed in prison clothing. He argued that the videotapes were inadmissible because they "violated his Fourteenth Amendment right not to be forced to appear in jail clothes or visibly shackled before the jury decided his fate." *Id.* at 716.

In denying the appellant's ineffectiveness claim, the Indiana Supreme Court acknowledged that, under both state and federal law, "a criminal defendant cannot be forced to appear in either jail clothing or shackles during the guilt or penalty phase of trial without an individualized finding that the defendant presents a risk of escape, violence, or disruption of the trial." *Id.* at 718 (citing, *inter alia*, *Deck*, 544 U.S. at 624; *Estelle*, 425 U.S. at 512). The court explained that compelling an accused to appear before a jury in jail clothing or shackles threatens to "dilut[e] the presumption of innocence," and creates a risk that the jury "might find guilt based on these extraneous influential factors rather than probative evidence subject to the rigors of cross-examination." *Id.* The court also noted that shackles could hinder the accused's ability to participate with counsel. *Id.*

The court concluded, however:

> *Deck* and its predecessors only discuss the use of jail clothing and visible shackles during *courtroom proceedings.* Ritchie was not forced to appear before the jury in jail clothing and shackles. Rather his claim is one step removed in that the jury viewed a videotape of Ritchie appearing in jail clothing and shackles while in police custody. The concerns with having a criminal defendant appear in jail clothing or shackles

in a courtroom proceeding are not directly applicable to Ritchie's situation. Certainly, his right to participate with counsel is not implicated. Additionally, it appears to this Court that the risk of diluting the presumption of innocence or guilt being established by an extraneous influential factor is minuscule. Ritchie presents no evidence of how viewing him in jail clothing and shackles on the videotape had a bearing on his verdict. Any reasonable juror would have expected Ritchie to be dressed in jail clothing and shackled when meeting with members of the public outside the security of a jail cell. *See generally Davis v. State,* 770 N.E.2d 319, 326 (Ind. 2002) (stating potential jurors would reasonably expect that anyone in police custody would be restrained).

*Id.* (emphasis original). Thus, the court opined that, had counsel made an objection to the admission of the videotape, it "would not have been sustained," and, even assuming counsel should have made an objection, the appellant "still has failed to show that, but for counsel's error, the outcome of the trial would have been different." *Id.* at 718-19.

In *Bramlett v. State*, 422 P.3d 788 (Okla. Crim. App. 2018), also cited by the Commonwealth, the appellant was arrested on a material witness warrant in Illinois following the murder of his ex-girlfriend in Oklahoma. After being taken into custody, the appellant, who was clothed in an orange jumpsuit and handcuffs, was interviewed by detectives; the interview was videotaped. The appellant denied seeing the victim on the night she was killed, claiming he last saw her several days earlier. When the detectives advised the appellant they had evidence to the contrary, he terminated the interview. At the appellant's subsequent trial for first-degree murder, defense counsel objected to the admission of the videotaped interview on the basis that it was unnecessarily prejudicial because it depicted the appellant in custody and in prison clothing, and he requested that an audio version of the interview be played for the jury instead. The trial court denied the objection, holding the videotape was probative because it allowed the jury to "see Bramlett's demeanor during the interview" in order to determine whether his statement was voluntary. *Id.* at 794.

On appeal, the Oklahoma Court of Criminal Appeals recognized the United States Supreme Court's holding that "routine use of visible shackling during the guilt phase of trial undermines the presumption of innocence, interferes with the accused's ability to communicate with his lawyer and participate in his own defense, and is an affront to the dignity of judicial proceedings," *id.* (citing *Deck*, 544 U.S. at 631-32), but declined to extend *Deck* to the case before it:

> Clearly, [the appellant's] appearance in the video in handcuffs and jail clothing had no bearing on his ability to communicate with his lawyer nor was it an affront to the judicial proceedings. While it is easy to understand how viewing a defendant in handcuffs and jail clothing during trial might risk diluting the presumption of innocence, the same cannot be said about exposure to a video showing the defendant in jail clothing and handcuffs during an interview prior to trial. As the State argues, most jurors would not be surprised by the fact that a defendant was handcuffed and wearing jail clothing while in jail prior to trial. The concerns which arise when a criminal defendant appears at trial in jail clothing or shackles were not implicated under the circumstances of this case. The same degree of potential prejudice was simply not present.

*Id.* (citation omitted). Accordingly, the *Bramlett* court concluded that the "video of the interview was relevant and its probative value was not outweighed by the danger of unfair prejudice," and, therefore, that the trial court did not abuse its discretion in admitting the videotape. *Id.* at 795.

The Commonwealth additionally cites *People v. Thames*, 467 P.3d 1181 (Colo. App. 2019), wherein the appellant, who was convicted of first-degree murder and first-degree sexual assault, appealed his judgment of sentence on the basis that, *inter alia*, the trial court erred in allowing the jury to view a videotape of his interrogation in which he was wearing prison clothing. The trial court had admitted the videotape for the purpose of showing the appellant's lack of surprise, anger, shock, and remorse to accusations that he beat, sexually assaulted, and fatally strangled the victim. In denying the appellant

relief, the Colorado Court of Appeals first observed that, in reviewing the trial court's admission of the videotape, it was obliged, under the balancing test set forth in its rules of evidence, to "assign to the evidence the maximum probative value and the minimum unfair prejudice that a reasonable fact finder might attribute thereto." *Id.* at 1191.

The court further rejected the appellant's claim that the admission of the videotape denied him his right to the presumption of innocence as recognized in *Estelle*, stating "[t]he presumption of innocence is undermined only 'when the defendant is required to *appear before the jury* in visible restraints or prison clothes.'" *Id.* at 1191 (emphasis original). The court opined that "[t]he risk of prejudicing the defendant due to his clothing is not present when the jury is shown a video depicting the defendant in a prison uniform," *id.* at 1191-92 (citing *Ritchie*, *supra*), and echoed the *Bramlett* court's finding that a jury's exposure to a video showing the defendant in handcuffs and a jail uniform prior to trial did not create a risk of diluting the defendant's presumption of innocence, because "[m]ost jurors would not be surprised by the fact that a defendant was handcuffed and wearing jail clothing while in jail prior to trial." *Id.* at 1192 (quoting *Bramlett*, 422 P.3d at 794) (alteration added).

Finally, the court in *Thames* concluded:

> Unlike the visual impact of a defendant's attire throughout a trial, the clothing shown in a video lasting one hour and fourteen minutes will not be a "constant reminder" of the defendant's condition or create a prejudicial, continuing influence in jurors' minds.
>
> [The appellant] does not contend that the trial court required him to appear in the courtroom in visible restraints or prison clothes. Rather, in the video, he is not restrained, is not handcuffed, and is depicted seated in what appears to be a conference room with pictures on the wall. Under these circumstances, [the appellant] was not deprived of his right to have the jury presume him innocent.

*Id.* (citation omitted).

Most recently, in *Early v. State*, 872 S.E.2d 705 (Ga. 2022), the Georgia Supreme Court rejected the appellant's claim therein that the trial court, in allowing the state to introduce body-camera footage showing the appellant in handcuffs and jail clothing, denied him his right to a fair trial and the presumption of innocence. In *Early*, the victim was fatally shot during an alleged drug purchase. Within an hour of the shooting, the appellant was arrested for the shooting. Later that evening, he was interviewed by a detective, and initially denied that he shot the victim. He then stated that he saw another man shoot the victim, but subsequently admitted to shooting the victim after a brief physical struggle. The appellant claimed he was afraid of the victim, and that he "blacked out" after the struggle and did not realize the gun was in his hand until he ran outside. *Id.* at 708.

Approximately six months after his arrest, while he was incarcerated pending trial, the appellant was being disciplined for an unrelated matter and police body-camera footage captured him stating "I'm a murderer." *Id.* at 709. The appellant's counsel filed a motion to exclude the body-camera footage at trial as unfairly prejudicial because it showed the appellant in handcuffs and jail clothing. The trial court denied the motion, holding that the probative value of the appellant's statement, as captured by the body-camera, was not substantially outweighed by the danger of unfair prejudice from the appellant's appearance in prison clothing. Before the state's high court, the appellant argued that the trial court abused its discretion in admitting the body-camera footage into evidence because it was highly prejudicial, and, under its rules of evidence, its probative value was substantially outweighed by undue prejudice. The appellant further argued, for the first time, that admission of the footage violated his constitutional right to the presumption of innocence and a fair trial under *Estelle* and *Deck.*

The Georgia Supreme Court first determined that the video was admissible under its rules of evidence, which provided that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* at 710. Specifically, the court held that the appellant's statement "I'm a murderer" was highly probative because the appellant was charged with murder, and the statement contradicted his trial testimony that he shot the victim in self-defense. The court also found that the video "was not overly prejudicial" because, *inter alia*, "the jury would not have been unfairly influenced by the fact that a defendant charged with murder was being detained while awaiting trial." *Id.*

With regard to appellant's reliance on *Estelle* and *Deck*, the court determined that those cases were distinguishable because the appellant did "not contend (and the record does not indicate) that he was shackled or forced to wear jail garb at any time during his trial." *Id.* at 711. The court further observed that it found no controlling authority from its own court, or the United States Supreme Court, "holding that the admission of a video at trial showing a defendant in jail wearing jail attire and handcuffs violated his constitutional rights. Indeed, many other courts have reached the opposite conclusion." *Id.* (citing, *inter alia*, *Ritchie*; *Thames*; *Bramlett*; *Taylor*). Thus, the court held that the appellant failed to demonstrate that the trial court's admission of the body-camera video was "plain error."[12]

In the instant case, Appellant concedes that "several courts have found that video imaging of the defendant in prison attire is not the 'constant reminder' that *Estelle* prohibits." Appellant's Brief at 24. However, in support of a contrary conclusion, Appellant

---

[12] As the appellant in *Early* first argued on appeal that he was entitled to relief under *Estelle*, the court reviewed his claim only for "plain error," which requires proof of an error that (1) was not affirmatively waived; (2) was clear and not open to reasonable dispute; (3) affected substantial rights; and (4) seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Early*, 872 S.E.2d at 711.

solely relies on the Kentucky Supreme Court's decision in *Deal v. Commonwealth*, 607 S.W.3d 652 (Ky. 2020).[13] In that case, the victim was fatally shot outside a nightclub during a fight with the appellant, Maurice Deal. After fleeing the scene, Deal went to the hospital for treatment of a hand wound. At the hospital, Deal was interviewed separately by two police detectives, and two days later, he was arrested and charged with the victim's murder. Unable to post bail, he remained in jail. Approximately two months after his arrest, one of the detectives met with Deal and his counsel at the jail for questioning; the interview was videotaped, and Deal was visibly handcuffed and wearing an orange jumpsuit that was clearly identifiable as prison attire. During the interview, Deal admitted to starting the fight with the victim, but denied knowing who fired the shots that wounded him and killed the victim.

On the morning of trial, Deal's attorney sought to preclude introduction of the videotape on the basis that it would unduly prejudice Deal because it would allow the jury to see him in custody, in handcuffs, and dressed as an inmate. The Commonwealth disputed that the videotape was prejudicial, suggesting that a jury would expect an individual charged with murder to be in custody pending trial. The trial court agreed, and denied Deal's motion, concluding that, because he was charged with murder, "no one would be surprised that he was in jail." *Id.* at 656. The 35-minute videotape was played in its entirety for the jury, and Deal was convicted of second-degree manslaughter by complicity.

Before the Kentucky Supreme Court, Deal argued that the trial court's admission of the videotape showing him in prison clothing was an abuse of discretion pursuant to *Estelle*. Recognizing the absence of a controlling decision from its court or the United

---

[13] Appellant also cites *Jackson v. Washington*, 619 S.E.2d 92 (Va. 2005). This decision is readily distinguishable from the instant matter, however, as the defendant in *Jackson* was compelled to stand trial before the jury while wearing prison clothing.

States Supreme Court, the *Deal* court noted that "other state appellate courts have considered cases that presented similar facts," and, in particular, examined the Tennessee Supreme Court's decision in *Taylor*, and the cases cited therein. *Id.* at 666. Notably, the *Deal* court stated that it did "not disagree" with the principle that "admitting video evidence depicting a defendant in jail custody is not 'inherently prejudicial' under all circumstances." *Id.* at 667. It further conceded that "[c]ommon sense suggests that the impact of allowing a brief videotaped presentation to the jury depicting the defendant in jail attire or shackles is not as damaging as requiring a defendant to appear that way in person before the jury." *Id.* Nevertheless, the court stated:

> we remain convinced that videos of the defendant "bearing badges of custody" pose a threat to the defendant's right to a fair trial because it tends to suggest to the jury that some official determination has already been made that the defendant needs to be restrained and separated from society. This is especially true when, as in Deal's case, the jury was able to see and hear testimony to the effect that the jail interview was recorded months after the defendant was arrested on the underlying charges.

*Id.* Ultimately, the court concluded that Deal was entitled to relief "because the video was prejudicial based on specific circumstances of Deal's case," *id.*, and the trial court failed to engage in the appropriate analysis to determine whether the evidence was "nonetheless justified by some identifiable and essential state interest." *Id.* at 664.

As the above cases illustrate, courts have declined to hold that a jury's observation of a videotape showing a defendant in prison clothing is *per se* error requiring a new trial, and we likewise reject such a proposition, which even Appellant does not endorse. Further, the general consensus, with which we also agree, is that a jury's observation of a videotape showing a defendant in prison clothing does not carry the same risk to the presumption of innocence as a jury's in-person observation of a defendant wearing prison

clothing or restraints in the courtroom.[14]  That said, we do not discount the possibility that

a jury's observation of a videotape showing a defendant in prison clothing might, under

---

[14] The dissent rejects our conclusion that a jury's observation of a videotape showing a defendant in prison clothing does not carry the same risk to the presumption of innocence as a jury's in-person courtroom observation of a defendant in prison clothing or handcuffs. *See* Dissenting Opinion (Wecht, J.) at 4.   Relying on *Holbrook v. Flynn*, 475 U.S. 560 (1986), Justice Wecht suggests that, regardless of whether the jury observes a defendant wearing prison attire in a videotape played at trial or in person during trial, it conveys to the jury the "unmistakable indication of the need to separate a defendant from the community at large." *Id.* (quoting *Holbrook*, 475 U.S. at 569).  *Holbrook*, however, did not involve a jury's observation of a defendant in prison clothing.  Rather, the defendant in *Holbrook* complained that the presence of four armed uniformed police officers in the front row of the spectators' section of the courtroom prejudiced his right to a fair trial.  In rejecting this argument, the high Court distinguished "the use of identifiable security officers from courtroom practices we might find inherently prejudicial," stating:

> [w]hile shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.  Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence.

*Holbrook*, 475 U.S. at 569.  In the case before us, as noted, Appellant appeared throughout his three-day trial in civilian clothing, without handcuffs, and there was nothing to suggest to the jury that Appellant was dangerous or needed to be separated from the community at large.

Furthermore, although the videotape showed Appellant in prison clothing following his arrest and extradition to Pennsylvania nearly two years prior to trial, as the *Holbrook* Court explained, while an accused is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on the basis of "official suspicion, indictment, continued custody," this principle

> does not mean . . . that every practice tending to single out the accused from everyone else in the courtroom must be struck down.  Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.

*Id.* at 567.  In our view, the mere fact that the jury was reminded, in a 17-minute video, that Appellant had been arrested two years earlier for the offense for which he was on trial does not trigger *Estelle*.

some circumstances, "divert the jury's attention away from its duty of weighing the evidence impartially." Pa.R.E. 403, Comment.

Accordingly, we hold that, in determining whether a jury should be permitted to view a videotape which shows a defendant in prison clothing, it is sufficient for a trial court to analyze the challenged evidence under Rule 403 of our Rules of Evidence, which requires a court to weigh the probative value of the evidence against the danger of unfair prejudice. However, in considering the danger of unfair prejudice resulting from the jury's observation of a videotape showing the defendant in prison clothing, the court should assess the degree to which the videotape will serve as a "constant reminder of the accused's condition" that may affect a juror's judgment, or whether it is likely to be a "continuing influence throughout the trial," creating a risk that the jury will consider impermissible factors in reaching its decision. *Estelle*, 425 U.S. at 504-05. The greater the impact of the evidence in this regard, relative to its probative value, the more likely its admission should be prohibited.

In the case *sub judice*, after careful consideration of the facts of this case, including a review of the videotape, we conclude that the trial court did not abuse its discretion in admitting the videotape under Rule 403.[15] First, the videotape undoubtedly was probative

---

[15] The dissent faults us for "fail[ing] to criticize the trial court's abject failures in this case and fail[ing] to insist that trial courts in future cases perform the required assessment when confronted with evidence showing a defendant in jail garb." Dissenting Opinion (Wecht, J.) at 13-14. Specifically, Justice Wecht insists that "[t]rial courts are required to employ the safeguards contemplated in *Estelle* and *Deck*," and maintains that "[w]e are bound to remind them of that duty here." *Id.* at 14. The dissent's position in this regard, however, is based on his conclusion that the videotape in the instant case served as a constant reminder of Appellant's condition in violation of *Estelle*, a position we have rejected; thus, a *Deck* analysis is not implicated in the instant case. Moreover, as discussed previously, *Deck* prohibits a defendant from being forced to appear *in the courtroom* in visible restraints or prison clothing, absent a justifiable essential state interest, such as security. As Appellant was not forced to appear in the courtroom in restraints or prison clothing, again, a *Deck* analysis is unnecessary.

because it showed Appellant making numerous false statements to the police, which evidenced Appellant's consciousness of guilt.

Although the videotape clearly showed Appellant in prison clothing, the record reveals that, prior to the videotape being played, the jury was informed that the interview took place after Appellant was arrested and extradited to Pennsylvania for the alleged murder of the Victim; thus, the jury knew that Appellant was in jail awaiting trial for the Victim's murder, and not for another crime.

Further, the videotape was relatively short – only 17 minutes long – and was played for the jury on the final day of Appellant's three-day trial. As a result, we find that the videotape was not the type of "constant reminder" of Appellant's condition that would have the effect of diluting the presumption of innocence under the principles of *Estelle*; it was not "a continuing influence throughout the trial" that created an unacceptable risk of "impermissible factors coming into play" in the jury's judgment.[16] *Estelle*, 425 U.S. at 504-05.

Finally, to the extent Appellant relies on *Deal*, that case is clearly distinguishable from Appellant's case in several significant respects. First, in granting relief, the *Deal* court observed that, "[u]nlike the defendant in *Taylor,* Deal was depicted in the video wearing both jail clothing and shackles." *Deal*, 607 S.W.3d at 667. In the instant case,

---

[16] By contrast, Justice Wecht seems to suggest that *any* observation of a defendant in prison clothing by the jury, regardless of its length, warrants relief, opining that it is "highly unlikely" that the high Court "intended to set a time limit on constitutionally impermissible jury exposure," as such a rule would be unworkable. Dissenting Opinion (Wecht, J.) at 7. Notably, even Appellant does not suggest that any observation of a defendant in prison clothing, regardless of its duration, requires a new trial. Nevertheless, Justice Wecht accuses us of "dodg[ing]" the issue by failing to offer "criteria or parameters that instruct Pennsylvania courts how to know when the exposure was 'constant' and when it was not." *Id.* He further insists that, while *some* exposure may be considered *de minimis*, the 17-minute video in the instant case was not, and clearly triggered *Estelle*. As we have discussed, we disagree that the 17-minute videotape served as a *constant* reminder of Appellant's condition, a conclusion we find to be consonant with *Estelle* and its progeny, and consistent with the principle that cases should be read against their facts.

the portion of the videotape played for the jury does not show Appellant in shackles. The *Deal* court also stressed that the trial court therein "dismissed Deal's requests to require the Commonwealth to present the audio version of his interview." *Id.* In the instant case, Appellant never requested that the Commonwealth play only the audio portion of his interview. Last, the court in *Deal* noted that the trial court failed to consider other ways in which to minimize the potential prejudice to Deal, such as by "admonishing the jury that Deal's appearance in the video should not be considered in determining guilt." *Id.* at 668. In the case *sub judice*, the trial court offered to give the jury a cautionary instruction, but Appellant declined.

Having concluded that the trial court did not abuse its discretion in admitting the videotape of Appellant's interview by police, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Chief Justice Baer and Justices Dougherty, Mundy and Brobson join the opinion.

Justice Wecht files a dissenting opinion in which Justice Donohue joins.